**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ACADEMY OF PEDIATRICS, *et al.*,

        *Plaintiffs,*

vs.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the Department of Health and Human Services, *et al.*,

        *Defendants.*

Case No. 1:25-cv-11916-WGY

Hon. William G. Young
Magistrate Judge Hon. M. Page Kelley

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**FOR LACK OF SUBJECT-MATTER JURISDICTION**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 1

       A.    The Individual Plaintiffs .................................................................... 1

       B.    The Associational Plaintiffs ................................................................ 4

III.   ARGUMENT ...................................................................................................... 6

       A.    The Applicable Legal Standard .......................................................... 6

       B.    The Individual Plaintiffs Have Standing ............................................ 10

       C.    The Associational Plaintiffs Have Standing ...................................... 12

       D.    AAP Has Established Organizational Standing .................................. 18

IV.    CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2022) ................................................................................................. 13

*Adams v. Watson*,
    10 F.3d 915 (1st Cir. 1993) ................................................................................. 11, 13

*Alianza Americas v. DeSantis*,
    727 F. Supp. 3d 9 (D. Mass. 2024) ........................................................................ 19

*Am. Ass'n of Univ. Professors v. Rubio*,
    780 F.Supp.3d 350 (D. Mass. 2025) ................................................................. *passim*

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
    2025 WL 1548611 (D. Mass. May 30, 2025) ........................................................... 9

*Antilles Cement Corp. v. Fortuno*,
    670 F.3d 310 (1st Cir. 2012) ............................................................................... 8, 14

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................................. 8

*Boggs v. Boggs*,
    520 U.S. 833 (1997) ............................................................................................... 18

*Cain v. Niemela*,
    2020 WL 4249161 (Mich. Ct. App. July 23, 2020) ............................................... 18

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*,
    799 F.2d 6 (1st Cir. 1986) ........................................................................................ 9

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................. 7

*Comfort v. Lynn Sch. Comm.*,
    418 F.3d 1 (1st Cir. 2005) .................................................................................... 8, 19

*Conservation Law Found., Inc. v. Academy Express, LLC*,
    129 F.4th 78 (1st Cir. 2025) ..................................................................................... 7

*Conservation Law Found. v. Am. Recycled Materials, Inc.*,
    2017 WL 2622737 (D. Mass. June 16, 2017) .......................................................... 7

*Denny's, Inc. v. Cake*,
    364 F.3d 521 (4th Cir. 2004) .................................................................18

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ..............................................................................8

*Diamond Alt. Energy, LLC v. EPA*,
    145 S.Ct. 2121 (2025) .......................................................................8, 16

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ..........................................................................6, 13

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................19

*Housatonic River Initiative v. EPA*,
    75 F.4th 248 (1st Cir. 2023) ................................................................16

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ...............................................................9, 12, 15, 16

*Louis v. Saferent Sols., LLC*,
    685 F.Supp.3d 19 (D. Mass. 2023) .........................................................9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..............................................................................6

*Lyman v. Baker*,
    954 F.3d 351 (1st Cir. 2020) ..................................................................6

*Mangual v. Rotger-Sabat*,
    317 F.3d 45 (1st Cir. 2003) ..................................................................12

*Mass. Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*,
    2024 WL 2194260 (D. Mass. Apr. 16, 2024) .......................................6, 9

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ..............................................................................8

*Massachusetts v. U.S. Dep't of Health and Hum. Servs.*,
    923 F.3d 209 (1st Cir. 2019) ..................................................................7

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ............................................................................14

*New England Fishermen's Stewardship Ass'n v. Raimondo*,
    761 F.Supp.3d 141 (D. Maine 2024) ......................................................15

*New York v. U.S. Dep't of Homeland Sec.*,
   969 F.3d 42 (2d Cir. 2020) ........................................................................................9

*North End Chamber of Com. v. City of Boston*,
   761 F.Supp. 3d 269 (D. Mass. 2024) .....................................................................16

*Palandjian v. Foster*,
   842 N.E.2d 916 (Mass. 2006) .................................................................................18

*Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*,
   906 F.2d 25 (1st Cir. 1990) ....................................................................................16

*Rental Hous. Ass'n of Greater Lynn, Inc. v. Hills*,
   548 F.2d 388 (1st Cir. 1977) ..................................................................................14

*Roe v. Wade*,
   410 U.S. 113 (1973) ................................................................................................12

*S. Pac. Terminal Co. v. Interstate Commerce Comm'n*,
   219 U.S. 498 (1911) ................................................................................................12

*The Presbyterian Church (U.S.A.) v. United States*,
   870 F.2d 518 (9th Cir. 1989) ..................................................................................10

*Tignor v. Dollar Energy Fund, Inc.*,
   745 F.Supp.3d 189 (W.D. Pa. 2024) ......................................................................11

*TransUnion, LLC v. Ramirez*,
   594 U.S. 413 (2021) ................................................................................................11

*United Food & Commercial Workers Union 751 v. Brown Group, Inc.*,
   517 U.S. 544 (1996) ................................................................................................15

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023) .................................................................................11

*Victim Rights Law Ctr. v. Cardona*,
   552 F.Supp.3d 104 (D. Mass. 2021) ........................................................................7

*Washington v. Trump*,
   2025 WL 659057 (W.D. Wash. Feb. 28, 2025) ...............................................13, 15

*Webb v. Injured Workers Pharmacy, LLC*,
   72 F.4th 365 (1st Cir. 2023) ...................................................................................11

**Other Authorities**

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the
   Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) .................................6

iv

Charles A. Wright, *et al.*, Federal Practice and Procedure § 3531.9.5 (3d ed.)...............................9

Charles A. Wright, *et al.*, Federal Practice and Procedure § 3533.8 (3d ed.)...............................12

Federal Rule of Civil Procedure 12(b)(6) .......................................................................................8

# I.    <u>INTRODUCTION</u>

On May 27, 2025, the Secretary of Health and Human Services (the "Secretary") issued a "Secretarial Directive" (the "Directive") that injected chaos, confusion, and disruption into the American healthcare system that has caused concrete harm to all of the Plaintiffs. The Directive has created barriers to accessing the Covid-19 vaccine that has caused the Individual Plaintiffs financial and physical injuries. The Directive has caused financial harm to members of the Associational Plaintiffs by, *inter alia*, forcing them to work extra time for which there is neither a Current Procedural Terminology ("CPT") code to bill their time, nor a Health Care Common Procedure Coding System ("HCPCS") code that is reimbursed by health plans; *i.e.*, with no mechanism to get paid for the extra work time that the Directive has created for the Associational Plaintiffs' members, the Directive is forcing them to work for free. Plaintiff, the American Academy of Pediatrics ("AAP"), has had to divert significant resources to try to mitigate the damage that the Directive has caused to its members, to the patients whom its members care for, and to the organization; thereby establishing organizational standing not only for itself but all of the non-Individual Plaintiffs (hereafter, the "Associational Plaintiffs").

Plaintiffs have filed with this Memorandum declarations from the Jane Doe Plaintiffs and members of the Associational Plaintiffs that show the harm that is befalling them—and the American healthcare system—***now***. Defendants' motion should be denied, and this case should proceed to a trial on the merits so that the Court can hear and see how dire the circumstances are that warrant the Directive being vacated.

# II.    <u>STATEMENT OF FACTS</u>

## A.    **The Individual Plaintiffs**

In July 2025, Jane Doe 1, an M.D., visited her obstetrician who counseled her that because of the uncertainty the Directive had created, she (the obstetrician) was deviating from the standard

of care and recommending that Jane Doe consider trying to get a version of the Covid-19 vaccine that was developed for the 2024–2025 respiratory season earlier than 34 weeks gestation. *See* Ex. 1, Decl. of Jane Doe 1 ("JD1 Decl."), at ¶ 3. Getting the vaccine after 34 weeks gestation enhances the chances that antibodies generated by the vaccine will be passed onto the fetus and thereby protect the child during the first six months of life when the child is not eligible to get the Covid-19 vaccine. *Id.* Jane Doe 1 had heard of insurance carriers not covering the Covid-19 vaccine for pregnant women because of the Directive. *Id.* at ¶ 14. As a medical trainee with significant student loan debt and a baby on the way, she could not afford to pay hundreds of dollars out of pocket for the Covid-19 vaccine. *Id.* at ¶ 15. The stress of deciding whether to accept substandard protection and the concomitant stress of potentially having to pay out of pocket for the Covid-19 vaccine caused Jane Doe 1 to suffer loss of sleep, headaches, and fatigue, all of which affected her productivity at work. *Id.* at ¶¶ 9, 16. On top of all of this, Jane Doe 1 contracted Covid-19 on or about September 1, 2025. *Id*. at ¶ 10.

Jane Doe 2 also is pregnant and likewise encountered significant barriers to accessing the Covid-19 vaccine. *See* Ex. 2, Decl. of Jane Doe 2 ("JD2 Decl."), at ¶¶ 3, 7. When she tried at multiple pharmacies and at her own obstetrician's office to get the Covid-19 vaccine, pharmacists and her doctor's office outright refused to give her the vaccine because to do so was contrary to the new Centers for Disease Control and Prevention ("CDC") guidance. *Id.* at ¶¶ 7–10, 28. On June 4, 2025, Jane Doe 2 left work and drove to a local pharmacy, only to be denied a vaccine by the pharmacist. *Id.* at ¶ 10. The round trip of approximately 13 miles cost her $1.30 at a minimum. *Id.* at ¶¶ 11–14. Jane Doe 2 also spent hours making calls and sending messages back and forth between her physician's office, pharmacies, and a local urgent care because these providers were confused and uncertain due to the Directive as to whether they could administer the Covid-19

vaccine to a pregnant woman. *Id.* at ¶¶ 16–20, 23–24. This time that she spent trying at multiple locations to get the vaccine diverted Jane Doe 2 from focusing on the responsibilities of her job and reduced her productivity: harms that are directly traceable to the Directive. *Id.* at ¶¶ 14–15.

After she tried but was unable to get a Covid-19 shot in June, Jane Doe 2 was exposed to Covid-19 after a July 4 celebration. *Id.* at ¶ 25. The stress of possibly contracting Covid-19 shortly after she was unable to get the booster exacerbated her underlying anxiety disorder and prenatal depression, caused clinically significant sleep disturbances, and caused her to require dental intervention to address increased tooth-grinding. *Id.* at ¶ 26. Jane Doe 2 still suffers from anxiety, depression, and sleep disturbances as a result of being denied the Covid-19 vaccine. *Id.*

On August 14, 2025, a pharmacist denied Jane Does 3's teenage sons, Jimmy and Timmy Doe, Covid-19 vaccines because the Directive removed the recommendation that teenagers receive routine Covid-19 vaccinations. *See* Ex. 3, Decl. of Jane Doe 3 ("JD3 Decl.") at ¶¶ 4, 12–15. That August 14 encounter injured Timmy Doe, who is neurodivergent and suffers from severe anxiety, Attention-Deficit Hyperactivity Disorder ("ADHD"), and a needle phobia. *Id.* at ¶¶ 6–7. Timmy Doe had a full-blown panic attack at the pharmacy on August 14 that manifested in hyperventilating, shaking, crying, and clenching his teeth. *Id.* at ¶¶ 5–6, 13–14. When Jane Doe 3 made a second attempt to get the Covid-19 vaccine for her sons on September 12, Timmy had another anxiety attack that manifested with similar symptoms. *Id.* at ¶¶ 19–21. Had Timmy Doe not been denied the vaccine because of the Directive, Jane Doe 3 and Timmy would not have had to try a second time to get the vaccine, and Timmy would not have had to suffer another anxiety attack. *Id.* at ¶ 22. These injuries are directly traceable to the Directive. Jane Doe 3 also suffered an economic injury because her expenses for the electricity to charge her car on August 14, 2025,

resulted in no benefit at all when she was unable to obtain vaccinations for herself and her children. *Id.* at ¶ 25.

###    B.    The Associational Plaintiffs

The Directive has harmed and continues to harm the Associational Plaintiffs and their members. AAP member Dr. Suzanne Berman, a pediatrician who co-owns the only pediatric practice in her rural Western Appalachia county and neighboring counties in Tennessee, has been harmed by the Directive. Ex. 4, Decl. of Suzanne Berman ("Berman Decl."), at ¶¶ 1, 6–7. Seventy-five percent of Dr. Berman's practice are vulnerable children enrolled in Medicaid or the Children's Health Insurance Program ("CHIP") who rely on the Vaccines for Children ("VFC") program to get vaccinated without out-of-pocket costs. *Id.* at ¶¶ 6, 10–11. She must stock the Covid-19 vaccine at hundreds of dollars per dose because her practice's isolated location means that there are few, if any, other nearby locations that stock the vaccine in her area. *Id.* at ¶¶ 11–12. The Directive, however, has reduced uptake of the vaccine, which will leave her with unused vaccine that she cannot be reimbursed for or may be unable to return to the manufacturer and to get her money back. *Id.* at ¶¶ 13–17. Further, while she and her colleagues regularly counsel parents on their child's care, the move from a clear recommendation to shared clinical decision making ("SCDM") has resulted in a material increase in the frequency and duration of counseling parents of patients about the Covid-19 vaccine-time for which her practice is not paid when parents decline the vaccine. *Id.* at ¶¶ 17–18.

Similarly, Dr. Margie Andreae, an AAP member and pediatrician in Michigan; Dr. Mary-Cassie Shaw, an AAP member and pediatrician in North Carolina; and Dr. Thomas Boyce, a pediatric infectious disease specialist and member of the Infectious Disease Society of America ("IDSA"), have incurred financial harm because the Directive has required all of them to spend more time explaining the safety and effectiveness of the Covid-19 vaccine during preventative

4

visits, time for which there is no CPT code or HCPCS code that they can use to bill such time when the vaccine is declined. *See* Ex. 5, Decl. of Margie Andreae ("Andreae Decl."), at ¶¶ 10–14; Ex. 6, Decl. of Mary-Cassie Shaw ("Shaw Decl."), at ¶¶ 6–7; Ex. 7, Decl. of Thomas Boyce ("Boyce Decl."), at ¶¶ 9–11.

On August 19, 2025, the AAP released its annual immunization schedule that, for the first time in decades, materially diverged from the CDC's immunization schedule. *See* Ex. 8, Decl. of Molly O'Shea ("O'Shea Decl."), at ¶ 6. That same day, the Secretary posted a statement on X that not only was false and gratuitously disparaging of the AAP, but also threatened any doctor who "diverge[d] from the CDC's official list" with liability because they, according to the highest-ranking health official in the country, "are not shielded from liability under the 1986 Vaccine Injury Act." *Id.* at ¶ 7, Ex. C. Dr. Molly O'Shea, a pediatrician in Michigan who co-owns two practices and is a member of the AAP, took the Secretary's threat seriously and contacted her insurance agent about her malpractice coverage if she administered the Covid-19 vaccine contrary to the "CDC's official list." *Id.* at ¶¶ 1–2, 7–8. Her insurance agent told her: "my practices are not able to give the Covid vaccine or a prescription for the Covid vaccine to any healthy children because, if we do, we are likely not to be covered under our policy, and the carrier would likely not pay for defense counsel to defend us, in the event of a lawsuit over our decision to give the Covid vaccine to a child." *Id.* at ¶ 8.

Then there are the operational harms to the associations. In his declaration, the Chief Executive Officer of the AAP, Mark Del Monte, lists the many initiatives and activities that the AAP has been forced to implement to try to counteract the damage that the Directive has caused. *See* Ex. 9, Decl. of Mark Del Monte ("Del Monte Decl."), at ¶¶ 1, 4–9. Multiple different teams of AAP employees from multiple departments have been forced to divert many hours from other

AAP initiatives to spend that time on a myriad of activities aimed at dispelling the confusion and chaos that the Directive has injected into the American healthcare system. *Id.* at ¶¶ 7–9. The Directive has required Dr. James Lewis, a member of the American Public Health Association and the Health Officer of Snohomish County Health Department in Everett, Washington, to divert many of his working hours to efforts to change local and state laws, and internal policies that are tied to Advisory Committee on Immunization Practices ("ACIP") recommendations and CDC guidance. *See* Ex. 10, Decl. of James Lewis ("Lewis Decl."), at ¶¶ 5–8. Dr. Lewis is engaging in these efforts because the Directive and other actions emanating from the Secretary, the ACIP, and the CDC have caused him and his colleagues to lose trust in the decisions of the Secretary and his advisors. *Id.* at ¶ 5.

## III.    ARGUMENT

### A.    The Applicable Legal Standard

#### 1.    General Principles

Plaintiffs have standing when they can satisfactorily answer Justice Scalia's memorable question: "What's it to you?"[1] Put differently, Plaintiffs have standing when they have a "personal stake" in the dispute. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024); *accord, Am. Ass'n of Univ. Professors v. Rubio*, 780 F.Supp.3d 350, 374 (D. Mass. 2025). Standing requires a concrete and particularized injury in fact that is actual or imminent, fairly traceable to defendants' conduct, and likely redressable. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Injuries are "concrete" when they actually exist, *Lyman v. Baker*, 954 F.3d 351, 360 (1st Cir. 2020), and injuries are "particularized" when they affect the plaintiffs "in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1. *See also Mass. Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries*

---

[1] Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983).

*Serv.*, 2024 WL 2194260, at *4 (D. Mass. Apr. 16, 2024) ("To a lobster fisherman who had planned to fish in the relevant waters, the closure of those waters is a concrete, particularized, and actual injury."), *rev'd on other grounds*, *sub nom. Mass. Lobstermen's Ass'n, Inc. v. Menaches*, 127 F.4th 398 (1st Cir. 2025). Injuries are imminent where the threatened harm is "certainly impending" as opposed to conjectural or "too speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *accord Victim Rights Law Ctr. v. Cardona*, 552 F.Supp.3d 104, 123 (D. Mass. 2021), *order clarified on other grounds by Victim Rights Law Ctr. v. Cardona*, 2021 WL 3516475 (D. Mass. Aug. 10, 2021).

The quantum of injury need not be great; "[i]t is a bedrock proposition that a relatively small economic loss—even an identifiable trifle—is enough to confer standing." *Massachusetts v. U.S. Dep't of Health and Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019)*; see also Am. Ass'n of Univ. Professors*, 780 F.Supp.3d at 379.

An injury is traceable to the actions of a defendant where the plaintiff can show a "sufficiently direct causal connection between the challenged action and the identified harm." *Victim Rights Law Ctr.*, 552 F.Supp.3d at 123 (quoting *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020)). Traceability "does not mean that plaintiffs must show to a scientific certainty that defendant's actions, and defendant's actions alone, caused the precise harm suffered by plaintiffs. The fairly traceable requirement is not equivalent to a requirement of tort causation." *Conservation Law Found. v. Am. Recycled Materials, Inc.*, 2017 WL 2622737, at *3 (D. Mass. June 16, 2017) (cleaned up) (quoting *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 257 (3d Cir. 2005)); *see also Conservation Law Found., Inc. v. Academy Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025) ("A plaintiff can satisfy traceability by showing 'that the defendant's conduct is one among multiple causes' of the alleged

injury" (quoting 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Fed. Practice & Procedure § 3531.5 (3d ed. 2008))). Indirect relationships can be sufficiently traceable even if the causal link depends on the action of a third party. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997), *abrogated on other grounds as recognized in Teva Pharms. USA, Inc. v. Azar*, 369 F.Supp.3d 183, 200–201 (D.D.C. 2019). The predictable reaction of another party to a government action or the downstream effects of that action are sufficient to establish standing. *Diamond Alt. Energy, LLC v. EPA,* 145 S.Ct. 2121, 2134, 2136–37 (2025)*; Dep't of Com. v. New York,* 588 U.S. 752, 768 (2019).

As to redressability, the plaintiff "need only show that a favorable ruling could potentially lessen its injury." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012).

"At the pleading stage, the Court applies to questions of standing the same plausibility standard used to evaluate a motion under Rule 12(b)(6); the Plaintiffs, therefore, need not definitely prove their injury or disprove defenses but need only plausibly plead on the face of their complaint facts supporting standing." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 2025 WL 1548611, at *6 (D. Mass. May 30, 2025) (cleaned up) (quoting *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 307–08 (1st Cir. 2024)), *appeal docketed*, Case No. 25-1611 (1st Cir. June 24, 2025). As long as one plaintiff has standing, the litigation continues. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 11 (1st Cir. 2005) (en banc), *abrogated on other grounds by Parents Involved in Cmty. Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2007).

### 2. Associational Standing

Associations have associational standing to sue on behalf of their members if (1) the members have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief

requested requires the individual members to participate in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977); *Am. Pub. Health Ass'n*, 2025 WL 1548611 at *7 (D. Mass. May 30, 2025); *see also, e.g.*, *Mass. Lobstermen's Ass'n, Inc.*, 2024 WL 2194260, at *5 (holding that the Lobstermen Association had associational standing to challenge fishing regulations because the association existed to protect lobstermen and to advocate for the lobstering industry and the new rule was a threat to the industry). Where the relief requested is only injunctive in nature, individual members of an association are not required to participate in the lawsuit for an organization to exercise associational standing. *Mass Lobstermen's Ass'n, Inc.*, 2024 WL 2194260 at *5 (citing *Sexual Minorities Uganda v. Lively*, 960 F.Supp.2d 304, 326 (D. Mass. 2013)).

An association may also have standing "solely as the representative of its members even in the absence of injury to itself, in certain circumstances." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6, 10 (1st Cir. 1986) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

### 3.    Organizational Standing

Organizational standing exists when the challenged conduct causes "concrete and demonstrable injury to the organization's activities" together with a "consequent drain on the organization's resources" which is "more than simply a setback to the organizations' abstract social interests." *Am. Ass'n of Univ. Professors*, 780 F.Supp.3d at 379 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). If the members of an organization are injured, the organization has standing even if it has not suffered an independent injury. 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper Fed. Practice and Procedure § 3531.9.5 (3d ed.).

"[O]nly a perceptible impairment of an organization's activities is necessary for there to be an injury in fact[.]" *Louis v. Saferent Sols., LLC*, 685 F.Supp.3d 19, 32 (D. Mass. 2023); *see also New York v. U.S. Dep't of Homeland Sec.,* 969 F.3d 42, 60–63 (2d Cir. 2020) (holding that

organizations had standing to challenge regulation because the regulation at issue caused the organizations to divert resources to mitigate the impact of a regulation on members and individuals they serve); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 521–22 (9th Cir. 1989) (holding that the plaintiff church established organizational standing because it alleged that surveillance by the Immigration and Naturalization Service caused a decline in attendance and participation in programs).

### B.    The Individual Plaintiffs Have Standing

All three individual plaintiffs have suffered concrete injuries traceable to the Directive and redressable by this Court.

In July, shortly after the Directive was issued, Jane Doe 1, a pregnant doctor who practices in a hospital, was faced with the decision of whether to get the 2024–2025 Covid-19 vaccine instead of waiting for the 2025–2026 Covid-19 vaccine because she and her obstetrician were concerned that the Directive would reduce access to any Covid-19 vaccines and that payers might not cover the new Covid-19 vaccine due to the Directive. JD1 Decl. at ¶¶ 3–5. Plus, she contracted Covid-19.[2] *Id.* at ¶ 10. All of this exacerbated the stress of being pregnant, which manifested in her suffering loss of sleep, headaches, and fatigue, all of which affected her productivity at work. *Id.* at ¶¶ 9, 16. The stress that the Directive caused Jane Doe 2 to suffer because she was unable on multiple occasions to get the Covid-19 vaccine manifested in exacerbating her anxiety disorder, prenatal depression, and her clinically significant sleep disturbances, and also led her to require dental intervention to address increased tooth-grinding. JD2 Decl. at ¶¶ 26, 31. Jane Doe 3 had to witness her neurodivergent child have another anxiety attack when they tried for a second time to

---

[2] Defendants argue that Jane Doe 1's fear of contracting Covid is "pure conjecture" and "speculative." (ECF No. 103 at 10). That Jane Doe 1 contracted Covid on or about September 1, 2025 (JD1 Decl. at ¶ 10) shows that it was not conjecture or speculation that Jane Doe 1 would contract Covid; rather, it was predictable and foreseeable.

get the Covid-19 vaccine because they were refused the first time due to the Directive. JD3 Decl. at ¶¶ 5–7, 13–14. These physical injuries are sufficient for Article III standing. *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("[C]ertain harms readily qualify as concrete injuries under Article III. . . . If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Tignor v. Dollar Energy Fund, Inc.*, 745 F.Supp.3d 189, 201 (W.D. Pa. 2024) (fear, anxiety, and stress were sufficient, concrete injuries).

Jane Does 1 and 2 also spent hours talking with their medical providers, pharmacies, and urgent care locations, and sifting through insurance documents, to research whether and where they could get the Covid-19 vaccine and whether the shot would be covered by insurance. JD1 Decl. at ¶¶ 3–4, 12–14; JD 2 Decl. at ¶¶ 8–11, 15–24. This was time that they could have spent performing their jobs, a harm that is directly traceable to the Directive. *See, e.g.*, *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 377 (1st Cir. 2023) (holding that the time the plaintiffs spent responding to a data breach was a concrete legal injury where the time would otherwise have been put to profitable use).

The Jane Does suffered financial loss in their repeated attempts to get the Covid-19 vaccine after the Directive. JD1 Decl. at ¶¶ 13–15; JD2 Decl. at ¶¶ 9, 11–15; JD3 Decl. at ¶¶ 15, 25. Though small, $1.30 or less is sufficient to satisfy Article III standing. *Van v. LLR, Inc.*, 61 F.4th 1053, 1064 (9th Cir. 2023) ("Any monetary loss, even one as small as a fraction of a cent, is sufficient to support standing"); *cf. Adams v. Watson*, 10 F.3d 915, 924 (1st Cir. 1993) (holding that plaintiffs had standing and rejecting defendant's argument that class members' share of aggregate injury was minimal).

Finally, although Jane Doe 2 and Jimmy and Timmy Doe were able to get the Covid-19 vaccine, their injuries are not solely in the past. The harms they suffered are capable of repetition,[3] and if the Motion to Dismiss is granted, would evade review. *See e.g.*, *Roe v. Wade*, 410 U.S. 113, 125 (1973) ("Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be 'capable of repetition, yet evading review.'"), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *see also S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911); C. Wright, A. Miller, & E. Cooper, Fed. Practice & Procedure § 3533.8 (3d ed. 2025); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60–61 (1st Cir. 2003), appeal after remand, 383 F.3d 1 (1st Cir. 2004).

### C.    The Associational Plaintiffs Have Standing

The Associational Plaintiffs have Article III standing because they satisfy each of the *Hunt* elements: (1) their members have standing in their own right; (2) their interests at issue are germane to the associations' respective purposes; and (3) neither the claim asserted, nor the relief requested, require the individual members to participate in the lawsuit. *See Hunt*, 432 U.S. at 343. Further, all of the Associational Plaintiffs have demonstrated concrete, redressable injuries traceable to the Directive and redressable by this Court.

### 1.    First *Hunt* Element: The Associational Plaintiffs' Members Have Standing in Their Own Right

The members of the Association Plaintiffs have standing in their own right as individuals whom the Directive has harmed. Those injuries include the additional uncompensated time that Association members have had to spend because of the Directive and the likelihood of having to eat the cost of purchasing vaccine doses that go unused due to the Directive's suppression of

---

[3] Jane Does 1 and 2 could become pregnant again, and Jane Doe 3's son is likely to have another panic attack if they are faced with repeat difficulty in getting the Covid-19 vaccine.

vaccine uptake. *See* Ex. 5, Andreae Decl. at ¶ 14 ("losing about $150/day" in uncompensated time because of "vaccine refusal rates tied to the Directive"); Ex. 4, Berman Decl. at ¶¶ 15–16, 19 (likely not to be reimbursed or to be able to return vaccine doses that cost $104.54/dose or $847/dose). These financial losses are more than a trifle, and "a relatively small economic loss—even an identifiable trifle—is enough to confer standing." *Adams*, 10 F.3d at 924.

The Secretary's threat of legal liability for administering vaccines contrary to CDC guidance also demonstrates sufficient harm. *See* Ex. 8, O'Shea Decl. at ¶¶ 7–8, Ex. C; *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 597 (2022) (holding that a wedding website designer, who declared she would not design a website for a same-sex couple, had standing, even though she had not yet been asked to design a website by a same-sex couple, based on the credible threat of legal consequences if she refused). To be sure, these harms satisfy the standard for injury in fact because they demonstrate a "personal stake" in the dispute. *All. for Hippocratic Med.*, 602 U.S. at 379.

In addition, the inability to prescribe or administer the Covid-19 vaccine or to practice medicine consistent with professional judgment or training are precisely the types of harms that the court in *Washington v. Trump,* 2025 WL 659057 (W.D. Wash. Feb. 28, 2025) held sufficient to establish standing. There, physicians challenged executive orders restricting access to gender-affirming care. The District Court concluded that individual physicians had standing to challenge parts of the order because it prevented them from delivering medically appropriate care and forced them to violate their ethical obligations to patients—even though the order had yet to be enforced, and the alleged injury had not yet actually materialized. *See id*. at *4–5.

The Directive has already created harm, which demonstrates a "substantial probability" of further injury if the Directive is not vacated. *See Adams*, 10 F.3d at 924 (noting that "the meaning of the term 'imminent' depends on the particular circumstances" and that government actions can

have "intractable, long-term consequences"). A party is not required to wait until it is "too late" for purposes of Article III standing. *Rental Hous. Ass'n of Greater Lynn, Inc. v. Hills*, 548 F.2d 388, 389 (1st Cir. 1977). To the contrary, courts have long held that a party who reasonably anticipates harm may bring suit and satisfy Article III's requirements. *Id.*; *see also Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 153–55 (2010) (holding that alfalfa farmers' allegations that their organic and conventional alfalfa crops would be infected with a generally engineered gene if the Animal and Plant Health Inspection Service deregulated the engineered gene were sufficient to establish Article III standing to challenge the deregulation order because they would have to conduct testing to determine if their crops were contaminated before continuing to market their product as non-genetically-engineered alfalfa). Plaintiffs have demonstrated through the declarations filed with this Opposition that they have already suffered harm and that the likelihood of future harm is high.[4]

Association Plaintiffs' members have satisfied the burden of stating a plausible claim of redressability because a ruling and preliminary injunction in their favor would relieve them of the harms caused by the Directive. *See, e.g., Am. Ass'n of Univ. Professors*, 780 F.Supp.3d at 378–79. To establish redressability, a plaintiff "need only show that a favorable ruling *could potentially* lessen its injury." *Antilles Cement Corp.*, 670 F.3d at 318 (emphasis added). The relief Plaintiffs seek is redressable. It will: (1) obviate the need to dedicate time and resources to navigating confusing changes in law and policy not supported by or in conflict with established science (*see* Ex. 9, Del Monte Decl. at ¶¶ 4–9; Ex. 10, Lewis Decl. at ¶¶ 5–8.); (2) relieve Plaintiff

---

[4] *See, e.g.,* Ex. 1, JD1 Decl. at ¶¶ 9, 15–16; Ex. 2, JD2 Decl. at ¶¶ 14–15, 26; Ex. 3, JD3 Decl. at ¶¶ 5–6, 13–14, 19–22; Ex. 4, Berman Decl. at ¶¶ 13–18; Ex. 5, Andreae Decl. at ¶¶ 10–14; Ex. 6, Shaw Decl. at ¶¶ 6–7; Ex. 7, Boyce Decl. at ¶¶ 9–10; Ex. 8, O'Shea Decl. at ¶¶ 6–8; Ex. 9, Del Monte Decl. at ¶¶ 4–9; Ex. 10, Lewis Decl. at ¶¶ 5–8; *see also* ECF 99, Second Amended Complaint for Declaratory and Injunctive Relief at ¶¶ 45–82 (detailing Defendants' changes to the healthcare and immunology landscape that Plaintiffs have been forced to endure).

organizations' members from spending more time counseling patients experiencing unfounded episodes of vaccine hesitancy, thereby affording their practices the opportunity to see and treat more patients (*see* Ex. 4, Berman Decl. at ¶¶ 10, 12–14, 17–19; Ex. 5, Andreae Decl. at ¶¶ 10–16; Ex. 6, Shaw Decl. at ¶¶ 6–8; Ex. 7, Boyce Decl. at ¶¶ 9–11); (3) reduce the risk of having to eat the cost of purchasing a supply of Covid-19 vaccine doses; and (4) provide clarity to Association Plaintiffs' members on their ability to administer the Covid-19 vaccine, thereby reducing the risk of threatened liability that Association Plaintiffs' members face for prescribing or administering vaccines in a manner that is inconsistent with the Directive, as suggested by the Secretary himself. *See* Ex. 8, O'Shea Decl. at ¶¶ 7–8, Ex. C; *see, e.g., Washington*, 2025 WL 659057, at *4–5.

### 2. Second *Hunt* Element: The Interests The Association Plaintiffs Seek Are Germane to Each Organization's Purpose

The second element of associational standing under *Hunt* requires that the interests an organization seeks to protect via litigation are germane to its organizational purpose. 432 U.S. at 343; *see also United Food & Commercial Workers Union 751 v. Brown Group, Inc.,* 517 U.S. 544, 555–56 (1996). Since Defendants' motion does not contest a failure to satisfy the second *Hunt* criterion, they have conceded this point. *See, e.g.*, *New England Fishermen's Stewardship Ass'n v. Raimondo*, 761 F.Supp.3d 141, 197 (D. Maine 2024), *appeal docketed*, Case No. 25-1212 (1st Cir. Mar. 7, 2025). Moreover, it is beyond cavil that the interests the Associational Plaintiffs seek to protect are germane to their purpose of supporting their members' efforts to protect and enhance public health through reliance on peer-reviewed, evidence-based, authentic science supported by data that has been analyzed, studied, debated, and voted on by credible subject-matter experts.

### 3. Third *Hunt* Element: Neither The Claim Asserted Nor The Relief Requested Requires The Participation Of Individual Members Of The Association Plaintiffs In The Lawsuit

The third *Hunt* criterion states that an organization has standing when "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. at 343. Individual members are not required to participate if the relief requested will "inure to the benefit of those members of the [Associations] actually injured." *Housatonic River Initiative v. EPA,* 75 F.4th 248, 265–66 (1st Cir. 2023) (quoting *Warth*, 422 U.S. at 515); *see also Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.,* 906 F.2d 25, 35–36 (1st Cir. 1990)*; North End Chamber of Com. v. City of Boston,* 761 F.Supp. 3d 269 (D. Mass. 2024), *appeal docketed*, Case No. 25-1063 (1st Cir. Jan. 17, 2025).

Here, the relief requested will inure to the Association Plaintiffs' members by restoring their ability to practice medicine and engage in initiatives to support public health according to peer-reviewed evidence and professional experience. *See Am. Ass'n of Univ. Professors*, 780 F.Supp.3d at 378–79. Further, vacating the Directive and restoring the recommendations to the CDC immunization schedules that pregnant women and children receive the Covid-19 vaccine will significantly reduce, if not eliminate, the amount of uncompensated time and wasted Covid-19 vaccine stock that medical practices are experiencing because of the Directive.

### 4.     The Associational Plaintiffs Plausibly Allege Injuries In Fact That Are Concrete And Imminent

The Association Plaintiffs have suffered a direct, immediate, and concrete injury as a result of the Secretary's Directive. The Supreme Court's recent decision in *Diamond Alternative Energy* controls here: "[t]he government generally may not target a business or industry through stringent and allegedly unlawful regulation, and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders." 145 S.Ct. at 2142. In that case, the Supreme Court determined that a group of fuel producers had standing to challenge an EPA regulation requiring a reduction in the manufacture of gasoline-powered vehicles. The Court

applied a traditional causation and redressability analysis and determined that the regulations raised the "'familiar' circumstance where government regulation of a business 'may be likely' to cause injuries to other linked businesses." *Id.* at 2136 (quoting *All. for Hippocratic Med.,* 602 U.S. at 384). As a result, the fuel producers had standing due to the likely downstream effects of the regulation. *Id.*

Here, as in *Diamond Alternative Energy,* the downstream negative effects of the Directive's regulation of pediatricians, maternal-fetal specialists, and other members of the Associational Plaintiffs who care for children or pregnant women, are predictable and—as the declarations filed herewith demonstrate—have already occurred. Further, the negative impact of the Directive gets worse by the day. Covid-19 cases are rising around the country and are anticipated to rise during the respiratory disease season in the fall,[5] but the Directive erects a barrier to access for individuals seeking the Covid-19 vaccine that can prevent illness, hospitalization, or death. The Directive forces health care providers to spend more time counseling patients on the Covid-19 vaccine in the face of past and anticipated increases in Covid-19 cases, but this is time for which they are often not compensated. The Directive will also in all likelihood result in unused vaccine doses for practices like Dr. Suzanne Berman's in Tennessee, the cost of which her medical practice will likely have to bear at least partially.

The Directive also injures the Associations' members by putting them on the horns of a dilemma: administer the Covid-19 vaccine contrary to CDC guidance and be exposed to liability (according to the Secretary) that may not be covered under the providers' malpractice insurance policy (*see* Ex. 8, O'Shea Decl. at ¶¶ 7–8); or act against their conscience and ethics and either not

---

[5] The current CDC statistics are available at: https://www.cdc.gov/covid/php/surveillance/index.html (Accessed Sept. 23, 2025).    The CDC's projections for Covid-19 for the respiratory disease season are available at: https://www.cdc.gov/cfa-qualitative-assessments/php/data-research/season-outlook25-26.html (accessed Sept. 25, 2025).

administer the vaccine or advise patients not to get the Covid-19 vaccine, inconsistent with the applicable standard of care, and thereby potentially be exposed to liability under state medical malpractice laws. *See, e.g., Cain v. Niemela*, 2020 WL 4249161, at *6 (Mich. Ct. App. July 23, 2020) ("A plaintiff in a medical malpractice action must establish, among other elements, the applicable standard of care governing the defendant doctor's actions and that the defendant doctor breached that standard." (quotation marks omitted) (quoting *Elher v. Misra*, 878 N.W.2d 790, 795 (Mich. 2016)); *Palandjian v. Foster*, 842 N.E.2d 916, 920 (Mass. 2006) ("To prevail on a claim of medical malpractice, a plaintiff must establish the applicable standard of care and demonstrate both that a defendant physician breached that standard, and that this breach caused the patient's harm.").

Thus, the Directive, buttressed by the Secretary's threat, put providers in an intractable conflict situation:  either comply with federal guidance or comply with their applicable standard of care governed by state law that is inconsistent with federal guidance. Either option exposes them to potential liability that is traceable to the Directive. *See, e.g., Boggs v. Boggs*, 520 U.S. 833, 844 (1997) ("In the face of this direct clash between state law and the provisions and objectives of ERISA, the state law cannot stand. . . . where compliance with both federal and state regulations is a physical impossibility"); *Denny's, Inc. v. Cake*, 364 F.3d 521, 527 (4th Cir. 2004) (where a state law conflicts with an ERISA plan, "the plan's fiduciary faces a Hobson's choice: obey the state law, and risk violating the provisions of the plan and hence ERISA, or disobey the state law and then raise ERISA preemption as a defense in a state enforcement action and risk breaking the law.") (cleaned up).

### D.    AAP Has Established Organizational Standing

AAP has put forth sufficient facts to establish of organizational standing. Because of the confusion and uncertainty that the Directive has caused about the Covid-19 vaccine, AAP has been

forced to update FAQs, policy statements, and other guidance on the Covid-19 vaccine; update its own immunization schedule to reflect guidance contrary to the CDC's current immunization schedules; conduct multiple webinars that have taken hours to prepare to try to dispel the confusion that the Directive has caused; answer individual inquiries from many of the AAP's 67,000 members about what they and AAP should recommend to patients about the Covid-19 vaccine; engage in ongoing advocacy with payers about Covid-19 coverage; hold multiple meetings with other professional societies to try to achieve alignment and consensus on how to address the damage caused by the Directive; and much more. Multiple AAP teams of employees have spent many hours on these efforts that could have been spent on other public health initiatives that the AAP would like to pursue. The Directive has caused AAP to divert significant resources from other core activities and has harmed their members. *Havens,* 455 U.S. at 379; *Ass'n of Univ. Professors*, 780 F.Supp.3d at 379 ("Organizational standing allows an organization to sue when, like an individual, it has 'alleged a personal stake in the outcome of the controversy,' because the challenged actions have caused 'concrete and demonstrable injury to the organization's activities,' with a 'consequent drain on the organization's resources' that is 'more than simply a setback to the organizations' abstract social interests.'" (quoting *Havens,* 455 U.S. at 379)); *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 47 (D. Mass. 2024) ("[A]n advocacy organization can establish that it suffered an injury by showing that 'its mission has been frustrated by the challenged conduct <u>and</u> it has expended resources to combat it.'" (quoting *Equal Means Equal v. Dep't of Ed.*, 450 F. Supp. 3d 1, 7 (D. Mass. 2020))).

"So long as one plaintiff has standing to seek a particular form of global relief, the court need not address the standing of other plaintiffs seeking the same relief." *Comfort,* 418 F.3d at 11. Accordingly, as the AAP has stated a plausible injury claim to establish organizational standing,

the Court need not address whether the other Associational Plaintiffs satisfy the elements of organizational standing doctrine.

## IV.    CONCLUSION

Based on the foregoing facts, arguments, and authorities, Defendants' Motion to Dismiss should be denied in its entirety.

Dated: September 24, 2025                     Respectfully submitted,


By:    *James J. Oh*
_____
James J. Oh (*admitted pro hac vice*)
Kathleen Barrett (*admitted pro hac vice*)
Carolyn O. Boucek (*admitted pro hac vice*)
Lydia Pincsak (*admitted pro hac vice*)
EPSTEIN BECKER & GREEN, P.C.
227 W. Monroe Street, Suite 4500
Chicago, IL 60606
Tel:    312.499.1400
Fax:    312.845.1998
Email: joh@ebglaw.com
            kbarrett@ebglaw.com
            cboucek@ebglaw.com
            lpincsak@ebglaw.com

Elizabeth J. McEvoy (BBO No. 683191)
EPSTEIN BECKER & GREEN, P.C.
One Financial Center, Suite 1520
Boston, MA 02111
Tel:    617.603.1100
Fax:    617.249.1573
Email: emcevoy@ebglaw.com

Richard H. Hughes IV (*admitted pro hac vice*)
Stuart M. Gerson (*admitted pro hac vice*)
Robert Wanerman (*admitted pro hac vice*)
William Walters (*admitted pro hac vice*)
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, DC 20037

Tel:     202.861.0900
Fax:     202.296.2882
Email:  rhhuges@ebglaw.com
          sgerson@ebglaw.com
          rwanerman@ebglaw.com
          wwalters@ebglaw.com

Marguerite Stringer (*admitted pro hac vice*)
EPSTEIN BECKER & GREEN, P.C.
6000 Poplar Avenue, Suite 250
Memphis, TN 38119
Tel:     901.712.3200
Fax:     615.691.7715
Email:  mstringer@ebglaw.com

Jeremy A. Avila (*admitted pro hac vice*)
EPSTEIN BECKER & GREEN, P.C.
57 Post Street, Suite 703
San Francisco, CA 94104
Tel:     415.398.3500
Fax:     415.398.0955
Email:  javila@ebglaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed and served through the ECF system upon the following parties on this 24th day of September 2025:

Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services

Marty Makary, in his official capacity as Commissioner of the Food and Drug Administration

Jay Bhattacharya, in his official capacity as Director of the National Institutes of Health

Jim O'Neill, in his official capacity as Acting Director Centers for Disease Control and Prevention

c/o Leah Belaire Foley, US Attorney
Michael L. Fitzgerald
Office of the US Attorney for the District of Massachusetts
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
michael.fitzgerald2@usdoj.gov

c/o Isaac Belfer
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044-0386
Isaac.C.Belfer@usdoj.gov

*/s/ James J. Oh*
James J. Oh