UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN ACADEMY OF              )
PEDIATRICS, ET AL.,              )
                                 )
        Plaintiffs,              )
                                 )      No. 1:25-cv-11916-BEM
v.                               )
                                 )
ROBERT F. KENNEDY, JR.,          )
ET AL.,                          )
                                 )
        Defendants.              )

BEFORE THE HONORABLE BRIAN E. MURPHY
UNITED STATES DISTRICT JUDGE

Motion Hearing

March 4, 2026
9:05 a.m. - 11:41 a.m.

John Joseph Moakley United States Courthouse
Courtroom No. 12
1 Courthouse Way
Boston, Massachusetts 02210

Jennifer M. Vaillancourt, RPR, CSR #154422
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 7205
Boston, Massachusetts 02210
E-mail:  Jenn.m.vaillancourt@gmail.com

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
JAMES J. OH, ESQ.
Epstein Becker & Green, P.C.
227 W. Monroe Street, Suite 4500
Chicago, Illinois 60606
(312)499-1400
Joh@ebglaw.com

ELIZABETH J. MCEVOY, ESQ.
GIANNA COSTELLO, ESQ.
Epstein Becker & Green, P.C.
One Financial Center, Suite 1520
Boston, Massachusetts 02111
(617)603-1100
Emcevoy@ebglaw.com
Gcostello@ebglaw.com

DANIELLA R. LEE, ESQ.
Epstein Becker & Green, P.C.
201 East Kennedy Boulevard, Suite 1260
Tampa, Florida 33602
(813)367-9440
Dlee@ebglaw.com

RICHARD H. HUGHES, IV, ESQ.
WILLIAM WALTERS, ESQ.
Epstein Becker & Green, P.C.
1227 25th Street NW, Suite 700
Washington, D.C. 20037
(202)861-0900
Rhhughes@ebglaw.com
Wwalters@ebglaw.com

ON BEHALF OF THE DEFENDANTS:
ISAAC BELFER, ESQ.
JAMES W. HARLOW, ESQ.
Department of Justice
Civil Division, Consumer Protection Branch
1100 L Street NW
Washington, D.C. 20005
(202)305-7134
Isaac.c.belfer@usdoj.gov
James.w.harlow@usdoj.gov

KATRINA HODGES, ESQ.
U.S. Department of Health and Human Services (HHS)

P R O C E E D I N G S

THE CLERK:  All rise.

(The Honorable Court entered.)

THE CLERK:  This Honorable Court is now in session. Judge Brian Murphy presiding.  You may be seated.

Civil Action Number 25-11916, American Academy of Pediatrics, et al. versus Kennedy, et al.

If counsel could please identify yourselves starting with Plaintiffs' counsel?

MR. OH:  Good morning, Your Honor.  James Oh on behalf of the plaintiffs.

THE COURT:  Good morning, Mr. Oh.

MS. MCEVOY:  Good morning, Your Honor.  Elizabeth McEvoy also on behalf of the plaintiffs.

THE COURT:  Good morning, Ms. McEvoy.

MR. HUGHES:  Good morning, Your Honor.  Richard Hughes on behalf of the plaintiffs.

THE COURT:  Good morning, Mr. Hughes.

MS. LEE:  Good morning, Your Honor.  Daniella Lee on behalf of the plaintiffs.

THE COURT:  Good morning, Ms. Lee.

MS. COSTELLO:  Good morning, Your Honor.  Gianna Costello on behalf of the plaintiffs.

THE COURT:  Good morning, Ms. Costello.

MR. WALTERS:  Good morning, Your Honor.  Will Walters on behalf of the plaintiffs.

THE COURT:  Good morning, Mr. Walters.

MR. BELFER:  Good morning, Your Honor.  Isaac Belfer for the Department of Justice for the government.  I'm joined by James Harlow for the Department of Justice and Katrina Hodges for the Department of Health and Human Services.

THE COURT:  Good morning to you, all.  Thank you, all, for being here.

MR. OH:  I might as well make some introductions again, or --

THE COURT:  Sure.

MR. OH:  -- I'll at least acknowledge some --

THE COURT:  Go ahead.

MR. OH:  -- people in the courtroom.  We do have members of the American Academy of Pediatrics and the Massachusetts Chapter of the American Academy of Pediatrics.  I won't make you stand up.  Okay.

And I also would just like to point out that one of my new best friends is here in the back of the courtroom.  His name is Rick Jaffe.  He is counsel for Children's Health Defense who's -- who filed the motion to intervene.

THE COURT:  To intervene, yes.

MR. OH:  We had a nice chat.

THE COURT:  Good morning to you.

Thank you, all.  So you are -- we're here for further argument on the additional items that you've both briefed. I've reviewed your briefing very carefully, and so during oral argument, please don't feel the need to walk through it.

We are limited to an hour a side.  I'll give you the floor first, Mr. Oh.  During that -- during your presentation, I want you to briefly address the issue of the additional declarations.

I understand -- Mr. Belfer, I understand you're opposing it, but I don't think we have a written opposition from you yet; right?

MR. BELFER:  That's right.  We didn't have time.

THE COURT:  No.  I understand.  I wasn't faulting you, but you can feel free to address it orally.  I can tell you my initial position.

I need -- to be honest, need a little more time to review the declarations and so I can't say -- obviously, I can't fault you for not having opposed them since I have not managed to fully read them all, but my inclination would be to allow them in and to give you -- you can think about the amount of time you would want, if you want to file any opposition to the substance of them.

I don't, upon my initial review, think that they're going to move the needle in terms of resolving the preliminary injunction substantially, but I'll give you an opportunity to

be heard on that.

In addition, I know that your briefing is not due until tomorrow on whether or not ACIP is an advisory committee or not, and I know this was not an issue that was briefed before coming before me.

But you -- you saw the order that I issued on your briefing.  That issue I think is pretty central to at least how this case is resolved on a preliminary fashion, and so I would encourage you to address that as well.

With that, Mr. Oh, I'll give you the floor first.  You have an hour.  So by way of planning, we will take a break at 10:10.  Mr. Belfer, so you can put your thoughts together, we'll take a break for 10 minutes, and then I'll hear from you.

MR. OH:  Thank you, Your Honor.

Let me get my computer to start.  So at the last hearing, Your Honor --

THE COURT:  Strong start.

MR. OH:  Yes.  And since brevity is the soul of wit and tediousness the limbs and outward flourishes, I will be brief.  I will say I will try to be brief.  That's from Hamlet Act 2, Scene 2, Lines 90 to 92.

And, Your Honor, do you know what the next line is after "I will be brief"?

THE COURT:  I do not.

MR. OH:  It is, "Your noble son is mad," and I'd like

the record to reflect that I am not referring to anyone in particular in this case.

So I thought I'd start off with a presumption of reviewability under the APA.  As you know, it's a very narrow exception.  It is a strong presumption of reviewability.

And, essentially, the government's position in this case is that Secretary Kennedy's actions cannot be reviewed. That, I don't think, is the law, and it should not be the law.

And we did find a case that I think addressed one of the questions you had last time around is -- is an agency required to follow its own rules, not necessarily regulations or law, but its own rules.

And *INS versus Yang*, 519 U.S. 26, an agency can limit the scope of its own discretion, quote, by rule -- there's a typo, sorry -- by rule or by subtle course of adjudication, a general policy by which its exercise of discretion will be governed, end of quote.

Once an agency so acts, quote, an irrational departure from the policy, paren, as opposed to an avowed alteration of it, closed paren, could constitute action that must be overturned as arbitrary and capricious or an abuse of discretion, end of quote, and I do not have the pinpoint cite for you.

There are many different types of actions.  Well, actually, there aren't.  There are a few types of actions that

are typically regarded as committed to agency discretion.  This is not one of them.

This isn't an enforcement -- a decision to enforce something.  This isn't a decision -- a pure judgment call on how money should be spent.

And this case is very well grounded in many different laws, and there are meaningful standards to be applied, and so I think that we should readily overcome the presumption that -- or readily overcome the narrow exception to the presumption of reviewability.

So before I get into the May directive, I thought I'd take stock of where we are right now.  So February 13th of 2026, when we were last here, that actually happened to be the one-year anniversary of the date that Secretary Kennedy was confirmed, so now we're about a year and two weeks after that.

And as you know, the last two elements of the preliminary injunction standard, balance of equities and public interest, they do kind of merge.

I kind of wish the First Circuit had more of a sliding scale approach when looking at preliminary injunction motions, because in this particular case, those two factors, balance of equities and public interest, are so important, and the evidence is so strong that the public interest is being damaged.

And because I only have an hour, I wanted to make sure

I got this in because when you start talking about pretty esoteric and arcane legal concepts under the Administrative Procedure Act, arbitrary and capricious, committed to discretion by law, we get into some of the facts, and you're talking about membership balance plans and -- and the EtR process, you can get down into the weeds and forget that in any litigation, there's always a human element to a case, right.

And in this particular case, the human element to this, you can easily lose sight of when you have some very difficult kind of ambiguous standards to apply, and you can get down in the weeds in the case law and forget or maybe just it's not top of mind that there are real dramatic human interests at stake here.

And so I just wanted -- I know you said you've read the briefs, but I thought that the last two pages of our brief captured this very well, and so I'm just going to read a couple paragraphs from the last two pages of our brief, then I'm going to move on.

This is on page 53 of ECF 184.  It says page 60 of 64 on the ECF stamp.  Quote, Courts have consistently held there's a strong interest -- public interest in health and safety citing the NIH case.  More critically, there is no public interest in the perpetuation of unlawful agency action and a strong public interest in having governmental agencies abide by the federal laws, citing cases.

That public interest is directly implicated here. Plaintiffs have demonstrated that the defendants failure to follow the customary evidence-based framework for vaccine recommendations has destabilized America's public health infrastructure and forced Plaintiff organizations, clinician members, and patients into a state of confusion, uncertainty, and perpetual crisis response mode.

By altering the CDC immunization schedule without ACIP evidence-based review or through an improperly constituted advisory committee, Defendants have replaced evidence-based recommendations with unexplained departures that have sown confusion and distrust among public health organizations, medical associations, providers, and patients alike.

These disruptions materially increase the risk of outbreaks of vaccine-preventable diseases including HepB and RSV, and we should have added measles in there.  Such harms cannot be remedied after the fact.

The defendants here are not preventing public health harm.  They are creating it.  Where unlawful government action undermines disease-prevention systems and leaves public health professionals unable to anticipate or contain outbreaks, the public interest weighs decisively in favor of injunctive relief.  So after a year and a couple weeks of Secretary Kennedy being in office, that is an accurate description of where we are with regard to public health.

So now I'm going to go back to the beginning. I'll be going through -- I won't be going through the January 5 schedule change, but I did want to put up this little timeline here --

THE COURT: Okay.

MR. OH: -- just to demonstrate that there's been an inconsistent use of process to change vaccine recommendations over the past year.

You start with the secretarial directive, unilateral decision, bypassing the ACIP, then fires the ACIP, and then their first vote in June, which we -- you saw in our status report we're withdrawing our question for preliminary relief on the June vote, goes to the September ACIP vote to downgrade the COVID-19 vaccine recommendation, then December 5 there's an ACIP vote to remove the HepB birth dose recommendation, but it flips back to a unilateral action through a decision memo very similar to the original directive that started this all.

And it's interesting that when the government filed their opposition late on Friday night, I saw that it was filed. It was a little bit too late for me to -- like, oh, I'm going to read this tomorrow.

And then lo and behold, there are these two decision memos dated May 12th of 2025 that we hadn't seen before, didn't know if anything existed to support the May directive, and it's interesting to note that the play there, I think, served as the

playbook for the decision memo, because, as you recall with the childhood schedule of January 5, they supported it through a -- an assessment by Martin Kulldorff and Tracy Beth Hoeg to justify the change to the schedule, and then they changed the schedule.

One week before the directive is dated, apparently, the secretary got memos from FDA and NIH and then from FDA to justify the changes that they made to the COVID recommendations through the directive.

In my view, it looks like there was a conclusion reached, and then they said draft us some memos that will support that conclusion.

So Plaintiffs believe that we are likely to succeed on the merits on the May 19 secretarial directive, and I'm going to run through the case law and the standards set forth in the case law. And, first, they failed to engage in reasoned decision-making by failing to follow the ACIP process.

Now, I've already played this May 27th video for you. Do you want to see it again, Your Honor, or just skip it?

THE COURT:  I remember it.

MR. OH:  Okay.  Oh, sorry.

THE COURT:  But it's your time, I mean.

MR. OH:  It's only 58 seconds long.

So this is the directive dated May 19th, 2025, that is the decision that instructs the CDC to remove the

recommendations on COVID regarding pregnant women and children.

And so when we first saw this directive, if you look at the third paragraph on the bottom, "based on a review of the recommendation of the FDA and National Institutes of Health," and then the next paragraph is based on a review of the recommendation of the FDA, you know, we thought that, oh, it must have been Doctors Makary and Bhattacharya advising the secretary.

And then because on the second one it said only the FDA, we thought, oh, maybe Bhattacharya doesn't agree with the -- with the recommendation with regard to pregnant women, but it turns out that there were -- apparently, that was a reference to these two memos.

So I just note that in our first CMC in this case well before you may have even known about this case existing, there was one action being challenged then.  It was the May directive.

And Judge Young said, I wouldn't think that the administrative record in support of that changed recommendation is extensive or hard to ferret out.  I'm a little bit surprised that we got these memos the Friday before the -- this PI hearing.

And to address the motion for leave, I mean, we scrambled over the weekend and found three declarants who know the process, two of whom were involved in the process last

year, Dr. Fiona Havers, who gave her presentation at the ACIP meeting in April, and Dr. Goldman who was on the COVID-19 work group. Neither of them had seen these memos before. And Dr. Jose Romero, a former ACIP chair, when he saw these memos, he was like, this is highly irregular.

So the irregularity of the process they followed here can be shown just by looking at the memorandum of -- the caption of the memorandum.

So there's Tracy Beth Hoeg who had been at FDA for all of a month by then. She was initially hired as a special consultant, and then for some reason, she's been, kind of, working her way up.

And she gave a memo about the safety issues allegedly with the COVID-19 vaccine for pregnant women. She, at this particular time, I believe, was still a consultant in the FDA.

And then there's a memo from two individuals, one from NIH, one from FDA, regarding the recommendation for children less than 18 years of age.

That in and of itself shows arbitrariness and capriciousness. It does not follow the well-accepted process of how you make changes to recommendations to the CDC schedule.

So the declarations that we were able to procure since Saturday, so Dr. Fiona Havers, she resigned on June 16th because she could, quote, no longer continue with the health secretary Robert F. Kennedy, Jr. -- while the health secretary

Robert F. Kennedy, Jr., dismantled the careful processes that helped formulate vaccination standards in the U.S.  She's been at the CDC for 13 years, up to that point very involved with the ACIP, and she didn't know about the memos, and she is confident that no career CDC officials knew about these memos until well after the fact.

Dr. Goldman had been on the COVID-19 work group since inception.  He never saw, received, discussed, or was informed of these memos.

And the former ACIP chair finds these memos to be, quote, highly irregular, inappropriate, and a striking departure from the procedure that had been uniformly followed for decades.

No mention at all of the ACIP in these memos.  No explanation at all for anyone as to why the ACIP process was bypassed.

And the ACIP process, it provides a structured, transparent, evidence-based review process for engaging in a reasoned evaluation of the relevant factors.

And that process is what these doctors and the 67,000 other members of the AAP have relied on for years.  It has been a transparent process.  It's been open.  It has been credible.  It's been thoughtful, and it's been a process followed in good faith.

And given explanation, this is not just, we don't like

the government's policies; this is, we don't like that you are leaving us in the dark; you're not being transparent; you're not explaining, as you're supposed to do under the law, why you are jettisoning and departing from a process that we have all around this country grown to know and trust.  They failed to provide a satisfactory explanation.

In the video, the secretary makes the conclusory assertion that healthy kids and healthy pregnant women don't need the COVID vaccine.

Question, how do you define who's a healthy kid and a healthy pregnant woman?  Does that mean zero underlying conditions?  Does that mean one?  Does that mean that when you get the COVID vaccine, you shouldn't have the flu?

This is -- it's simply a conclusory, unsupported assertion that they don't need it.  It's like, hey, I am the secretary of Health and Human Services, trust me, but that is not the way that -- and the process by which vaccine recommendations have been or should be made in this country.

And so the explanation fails under the APA because it's merely conclusory.  *Association of American Universities versus Department of Defense*, 792 F. Supp. 3rd 143, and the NIH case 770 F. Supp. 3rd. 277 support that proposition.

Now, if we had played the video, you would have heard the secretary say, there's a lack of any clinical -- he says, "lack of any clinical data to support the repeat booster

strategy in children."

Dr. Makary says in that video, "There's no evidence that healthy kids need it today," and Dr. Bhattacharya says, "It's good science."

All three of those are false and misleading statements that was disseminated through social media to the world to see -- for the world to see.

The problem with those statements is that just a month before at the April 15, 2025, ACIP meeting, Dr. Fiona Havers gave a presentation, and we attached her presentation to her declaration.  It's a little bit mind-numbing if you try to read it but -- and understand it because there's a lot of medical jargon in there, and there's a lot of data.

And she concluded -- and if you got a chance to even glance through Dr. Havers' declaration, I went to the YouTube video of the ACIP meeting, and I put the link into her declaration, and I pulled this exact quote from what she said at the ACIP meeting.  Okay.

And it is set forth in her declaration at paragraph 11, and in that is also the time -- exact time at the meeting where she said this if you wanted to verify it, and believe me, I double-checked this.

So she said, quote, So in summary for pediatrics, rates of COVID-19 hospitalizations are highest among the youngest-aged groups.  Although, among school-aged children,

hospitalization rates are -- I'm sorry -- are generally -- have been higher for influenza than for COVID-19.  More than half of children and adolescents hospitalized with COVID-19 had more than one underlying condition, and this increased with increasing age, but a substantial proportion of children had no underlying medical conditions.  And the most common underlying conditions also varied by age groups.

And, again, as we saw, the vast majority of children who were hospitalized with COVID had not received the most recently recommended COVID-19 vaccine during the 2023/'24 season.

And then -- Dr. Robert Schechter actually presented before her, and then Dr. Ruth Link-Gelles presented after her.  And Link-Gelles is L-I-N-K, hyphen, G-E-L-L-E-S.  And this next name is a mouthful.  I don't know if I'll pronounce it correctly, but I'll give you the spelling, and then Dr. Lakshmi Panagiotakopoulos -- Lakshmi is L-A-K-S-H-M-I, and Panagiotakopoulos is P-A-N-A-G-I-O-T-A-K-O-P-O-U-L-O-S.

And they presented data with regard to vaccine effectiveness and deaths among children ages zero to 17, and they differentiated from zero to 17.  I think there's a little bit of a difference between children who are zero to six months, and zero to two, and someone who's 17.

One thing when you look at the Memoli/Brenner memo, they sweep everyone together.  It's everyone 17 and under.

There's no differentiation between the different ages and the different age cohorts between zero and 17.

And then inexplicably also just the week before the May 19th directive, Dr. Makary and then Dr. Prasad, who is now the director of what they call CBER, all caps, CBER, the Center of Biologics and Evaluation of Research, stated in their article that pregnancy and recent pregnancy are factors which increase a person's risk of severe COVID-19.

How Dr. Makary could then go appear on a video that's put out a couple weeks later to say that -- well, he was referring to children, but the message that comes across is there's no evidence to support these recommendations, and then, again, the secretary said, there's a lack of any clinical data when there was a wealth of data that was presented just a month before.

Not getting into intent now, but it's, like, oh, maybe they saw what's happening at the ACIP. He knew what he wanted to do, and so, oh, I'm not going to get what I need so I'm going to bypass them and get rid of this COVID-19 recommendation.

It's -- it's inexplicable. It's unexplained. It's contrary to the data that was presented, and that -- this is a quintessential example of arbitrariness and capriciousness.

But then to put it in case law jargon, quote, The evidence tells a story that does not match the explanation the

secretary gave for his decision, end of quote.  That's *Department of Commerce versus New York*, 588 U.S. 752 at 784.

And the *State Farm* case, I think, and *Department of Commerce versus New York* are two of the more applicable, relevant cases to this particular case, Your Honor.

And the thing about *State Farm* is that, like here, it involved a recission and taking away of what you could call a safety rule.

And in that decision, the Court found the decision to remove the requirement of automatic seat belts, that they were too quick to dismiss the safety benefits of it, and their reported assessments were far too quick to dismiss the safety efficacy and public health benefits, like here of the COVID vaccine for children and pregnant women.

I think *State Farm* and *Department of Commerce* really are controlling, and they provide this Court, I think, with a means to justify a decision in the Plaintiff's favor that can withstand scrutiny on appeal.

They fail to take into account serious reliance interests, and that is one of the huge, huge parts of this case.  Because, as you know, the ACIP, unlike the United States Preventive Services Task Force, has not been statutorily legislated into existence.

The ACIP was formed in 1964 by the Surgeon General. In 1972, it became a federal advisory committee when the

Federal Advisory Committee Act was passed.  And then as we went through on the 13th, Congress incorporated reliance on ACIP recommendations as adopted or not by the CDC director into 13 different laws.

And we also went back and looked at how many different sets of regulations are the ACIP incorporated into.  There are at least 17 sets of regulations.  I think around 14 of them are HHS regulations, but the DOD has a regulation, as does the immigration nationalization service that incorporates reference to and reliance on CDC recommendations, but that's just in statute and regulation.

But when you look at the real world, you've got people like Dr. Pring, the president of the Massachusetts Chapter of American Academy of Pediatrics, who is often in scrubs when we're on calls at the hospital, and she and other doctors, we have learned, are -- when a patient comes in with a question, sometimes the best thing to do and the quickest way to try to get an answer is to go to the CDC website and see what it says about an immunization.  That's how it works out there.  That's how when a pharmacist gets a question from a customer at the counter and they don't know necessarily how to answer it, they go to the CDC website.

And that trust has been built into the entire system in every corner of this country, and contrary to their -- the mantra, oh, we're trying to restore trust; we're trying to

restore trust, well, maybe one way to look at that is, did you actually take a look at whether or not on an action -- a unilateral action by the secretary is going to increase or decrease trust in the health care system before you -- before you go there?  They didn't do that.

So the directive itself is, like I said, we believe, a just very clear -- I know Mr. Belfer is going to dispute me -- but almost indisputable example of a decision that is unexplained, inconsistent, and didn't take into account reliance interest.

Now, if I segue into the constitution of the ACIP, that's when we could be getting into *Braidwood*-related questions, and -- but also, as you've recognized, if you agree that the ACIP was improperly constituted and that we have a likelihood of success on the merits on that particular issue, then one potential remedy is that the votes that they took, the actions that they took by a tainted advisory committee should be set aside, so then that's one fairly straightforward way to set aside ill-advised votes that they took without delving into the finer details.

We talked about membership balance plans last time around.

THE COURT:  We did.  We spent a long time on that, but I would like to hear more about how I'm supposed to distinguish this under *Braidwood*.

MR. OH:  So I'm going to start -- but if you don't mind, we might do a little tag team and --

THE COURT:  Sure.

MR. OH:  -- I might have Mr. Hughes jump in here, so --

THE COURT:  Because I do think that -- I understand why FACA is the easiest solution for you and why -- because I think you're right, right.  If there's a FACA violation, then everything that the ACIP did falls away, but I'm struggling with how to square that with what the Supreme Court said in *Braidwood*.

MR. OH:  So I think one pretty simple way to address *Braidwood* is that it doesn't apply here.  It's not relevant in that one huge -- a couple huge distinguishing factors.

One is that when Congress legislatively put the task force into existence through statute, okay, it actually specifically exempted the USPSTF from FACA.  There is a specific statutory provision that says that this task force is not a federal advisory committee.

A second way to distinguish it is -- and we can get into this some more, the ACIP charter itself says that we are a federal advisory committee subject to FACA.

And you're a former trial lawyer.  You know that when someone puts their signature on a document, that is like an admission against interests under the Federal Rules of

Evidence, 801(d)(2), right.

And Secretary Kennedy renewed the charter on December 3rd of 2025. His signature is there in blue for everyone to see, and the only changes he made to this new charter were to add the words "vice chair" in there a couple times, and there was maybe one more. Everything else stayed the same.

THE COURT: Okay.

MR. OH: So the secretary himself acknowledged on December 3rd, 2025, that the ACIP is a federal advisory committee subject to FACA.

If you want to go a little bit more into the weeds on *Braidwood*, then I might need to turn it over to Mr. Hughes.

THE COURT: I'd love to hear what Mr. Hughes has to say because I've spent a lot of time on this issue.

MR. HUGHES: Thank you, Your Honor.

THE COURT: And I recognize I'm at a disadvantage since your briefing's not due yet, so I haven't had the opportunity to review what you are doubtless preparing.

MR. HUGHES: Of course. And we will submit the supplemental brief tonight or tomorrow.

I teach a very niche law seminar actually on these committees, and so I can walk through it a little bit. They do bear some similarities, so they're -- obviously, both of these bodies are making evidence-based recommendations, and, of

course, the Affordable Care Act does reference both of those bodies in the recommendations, but that's really where the similarities end.  So the ACIP is a purely advisory committee, and *Braidwood* does not alter its status as an advisory committee.

As Mr. Oh said, the task force was established by a very specific statute.  That statute does not reference the task forces having advisory responsibilities.

The ACIP, on the other hand, was created under this general authority under 217(a)(a) to create discretionary advisory committees and councils.  That same statute at 217(a)(c) says that the secretary can delegate functions to those commitments which includes ACIP.

There are multiple statutes, and we've referenced many of them, that recognize that ACIP recommendations are not binding without further action by a politically accountable official, specifically the CDC director.

THE COURT:  Right.

MR. HUGHES:  That includes the ACA.  That includes the Medicaid statute, the Vaccines for Children Program, the Veterans Health Administration, and some others.

As Mr. Oh said, Congress did explicitly exempt the task force from FACA.  It did that in the ACA.  It had the wherewithal as it was adopting the preventive services coverage requirement to exclude -- to exempt the task force from FACA.

It did not do that with respect to the task force, and, of course, we can't read that silence to mean that it applies to the ACIP.  We'll provide further detail on that in our brief, but we have to presume that they were purposeful in making that choice.

Under FACA --

THE COURT:  Can I just pause --

MR. HUGHES:  Yes.

THE COURT:  -- you for one second?

MR. HUGHES:  Yes.

THE COURT:  I'm going to give you a full chance, but is your position that FACA applies?  Just so I understand whether -- because you didn't brief this either.  This is -- just briefly and then I'll give you your time.  Does FACA apply to the ACIP?

MR. BELFER:  Yes, it does.

THE COURT:  Okay.  Great.  Thank you.  That was the one, sort of, wrinkle that I was like -- I recognize that might be -- okay.

MR. OH:  Does that mean he can sit down?

THE COURT:  No.  Well, unfortunately -- unfortunately, I am required to make that conclusion on my own, but I appreciate that, so, no, please continue.

MR. HUGHES:  Thank you for that.  I do want to make sure that we're clear on what Justice Kavanaugh did in the

decision, and I think we will address that in detail in the supplemental brief.

But, you know, just to be clear, under FACA, ACIP is an advisory committee, and I think we've heard that, so the committee is not the final decider. It's not operational, so FACA applies.

And as Mr. Oh said, ACIP's always operated consistent with FACA. It has a designated federal officer. It renews its charter every year. It references FACA. The secretary just signed the renewed charter. It publishes all of its meetings, notices, and materials consistent with FACA.

*Braidwood* does not alter FACA's application to ACIP, and this is really where the differences become apparent, so the District Court in *Braidwood* actually disposed of the appointments clause question with respect to ACIP, and he found no appointments clause problem.

So he -- when he went through and distinguished each of these bodies, he, you know, pointed out that the CDC director must adopt the ACIP's recommendations, and he observed -- he said, you know, there's no ACA language that actually alters the background authority -- the advisory role of the ACIP, and so --

THE COURT: What if there is -- well, the secretary could or they could change the regulation to say that the secretary doesn't have to approve it; right?

MR. HUGHES: They could, but they couldn't change the statute that sits above that regulation. And Justice Kavanaugh did not address that statute -- that specific part of the statute, and this is 300gg-13.

THE COURT: Okay.

MR. HUGHES: And that is (a)(1) and 2 so under (a)(1) and 2, 1 is the task force, 2 is the CDC. 1 says the United States Preventive Services Task Force. 2 says the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention. So it is very clear that the committee is subordinate to the CDC, and so --

THE COURT: What if the CDC got rid of the regulation that said the secretary has to approve?

MR. HUGHES: The statute actually has that language in it, so --

THE COURT: You don't think -- so the secretary couldn't.

MR. HUGHES: The secretary -- I think so. I mean, I think the statute specifically references the CDC director, but I don't think you can get around the fact that the statute makes the ACIP a part of CDC.

THE COURT: I see. Okay.

MR. HUGHES: I think that --

THE COURT: That's great.

MR. HUGHES: -- solves it. Great.

THE COURT:  Thank you very much, Mr. Hughes.

MR. HUGHES:  Thank you.

MR. OH:  So with regard to the way the ACIP was constituted, our complaint and our brief focuses on it not being in accordance with law.

And so what is the law that says that you need -- at least back in 2025 before they amended the reg, what is the law that they needed to require -- that they needed to follow in terms of constituting the ACIP?

And there is a guidance that was issued by the GSA which manages all of the federal advisory committees.  You're supposed to follow your charter and your membership balance plan with them.  There is a database that contains the membership balance plans and the guidance which -- may I --

THE COURT:  Sure.

MR. OH:  -- approach?  And I actually have a copy this time for Mr. Belfer.

THE COURT:  Is this something I've seen before, or are you giving me something new?

MR. OH:  I don't think so.

THE COURT:  Okay.

MR. OH:  So if you look at the second paragraph under the introduction, this corresponding FACA final rule reiterates this requirement at 41 CFR, Section 102-3.30(c) and for discretionary -- I'm skipping the parenthetical -- and for

discretionary advisory committees being established, renewed, reestablished, or merged requires agencies to provide a description of their plan to attain fairly balanced membership during the charter consultation process with the committee management secretariat citing 41 CFR, Section 102-3.60(b)(3).

And this is the candidate identification process that is in the last membership balance plan that is in the FACA database, and that's from January of 2024.

THE COURT:  This is also the one we know is not valid anymore; right?

MR. OH:  Pardon me?

THE COURT:  We know that this is not valid anymore; right?

MR. OH:  It depends on what you mean by "valid," Your Honor.  In that, it was -- it's valid for application in 2025 but not for -- it doesn't have effect now in '26.

THE COURT:  Right.  I just want to make sure we're talking about the same thing for your presentation.

MR. OH:  This candidate identification process, which I do not need to go through entirely, identifies the process intended to be used to identify candidates for the federal advisory committee, and the summary is supposed to describe the process, et cetera, et cetera.

And then with regard to the ACIP secretariat, procedures for application for ACIP membership are detailed on

the website; solicitation of potential candidates is conducted by e-mail; solicitation of potential candidates is posted annually in the Federal Register.

So this is another section of the ACIP membership balance plan of 2024 which identifies criteria for selection, expertise in the field of immunization practices, multidisciplinary expertise in public health, expertise in the use of vaccines and immunologic agents, knowledge of vaccine development, evaluation, safety, and delivery, or in the case of a consumer representative, knowledge about consumer perspectives and/or social and community aspects of immunization programs.

Now, we went back, and we identified all the MBPs that are in the database. I think there's a gap during the pandemic from '20 to '24, but consistently over the last 10 to 12 years, the ACIP has been doing membership balance plans, filing them in the FACA database, quite frankly, following the law.

And then Dr. Romero was able to find some documents when he was chair of the ACIP. You had asked us: Does the steering committee really exist?

THE COURT: Right.

MR. OH: And so this is a meeting of the steering committee. It doesn't say that, but it is the steering committee where on August 24th of 2017 -- and this is a document that is attached to Dr. Romero's declaration, this

document shows that they're going to be meeting to review the candidacies to replace these four individuals and these areas of specialty or expertise.

And then -- this isn't the entire document, but that last paragraph on your screen, "Following our usual practice, we will aim to select candidates whose area of expertise, specialty, board certification is similar to that of the outgoing members."  So this is adherence to a practice, adherence to a process, a time-honored process for selecting nominees.

And so the way it actually -- there's a fair amount of legwork done before this meeting.  They actually have a spreadsheet, and I think I attached an example to Dr. Romero's declaration as well.

And there's a principal reviewer, a secondary reviewer, and their job is to come up with a nomination package to send upstairs to the secretary for a primary and secondary candidate for this position.

So the secretary decides for each open position between two of the nominees.  Now, he doesn't have to select those two.  Dr. Romero gave me an example of one time where the secretary may have gone to the third choice, but -- and then --

THE COURT:  The question was whether or not the steering committee existed when -- has existed during the period when the existing members were appointed.

MR. OH:  Which existed?  The current ones?

THE COURT:  Yes.

MR. OH:  I -- we have no knowledge that the steering committee was ever convened to discuss candidates.

THE COURT:  Right.  Okay.  I remember that came up last time, and I didn't think we had an answer on it.

MR. OH:  I'd be very surprised if there's any document produced in the administrative record that demonstrates that the ACIP chair sat down with the ACIP executive secretary and the vice chair and put together a nomination package and then others and then sent it up to the secretary.

THE COURT:  Okay.

MR. OH:  So these were ACIP steering committee meetings where, as you can see, pretty regularly in August, they had their meeting to select nominees.

And then as you saw in the membership balance plan, you post a notice in the Federal Register to solicit nominations.

And so we went back and over the last 20 years, these are all the notices posted, and I can perhaps, for your clerks, get you this -- copies of these two pages if you're interested.

THE COURT:  Sure.  Why don't you just submit the whole PowerPoint.

MR. OH:  I will.  Okay.  I'll take out the notes.

THE COURT:  Yes.  Please submit just the PowerPoint as

presented today.

MR. OH:  Yes.  Yes.

And so the last notice published in the Federal Register soliciting nominations was from July 18th of 2024, so failing to follow the process.

And I've been told I have a 10-minute warning.  I will not speak faster, though.

THE COURT:  But let me interrupt with a question that's maybe not directly on point.  There was a similar case that was filed in the -- I think in the Northern District of California.

MR. OH:  Yes.

THE COURT:  Do you have any insight about what's happening in that case and how it may or may not impact this one?

MR. OH:  I do.

THE COURT:  Feel free to share.

MR. OH:  I was answering the question I was asked, Your Honor.

So 15 states led by -- really by Arizona and California have filed.  I think that they contemplated filing here, but then Massachusetts decided not to join, and since Arizona and California were in the lead, they figured that they would stay closer to home and file there.

Their concerns, while similar, ultimately -- like,

remedy is -- that they seek is different because they are suing on behalf really of the public health systems in their states --

THE COURT:  Right.

MR. OH:  -- and the Medicaid funding.

And so their action, I think, it kind of mirrors ours in terms of the legal theories under the APA, but their interests and injunctive relief they're going to be seeking are slightly different.

THE COURT:  Okay.  Thank you.

MR. OH:  Okay.  So the September -- I thought that we had delineated how each particular agency action in and of itself standing alone caused injury, and for purposes of briefing, we did put them together under the ACIP process, non-ACIP process, but there has been injury independently flowing from each of these actions, and also, the September and December '25 actions, because they are both ACIP votes, they can be at least analyzed together for purposes of liability here.

And there's a failure to engage in reasoned decision-making with regard to both of these actions; didn't follow GRADE, EtR; didn't consult the COVID work group.

And this is -- one of the big problems is that when there has been a change to SCDM or when the advisory committee initially says, we're going to recommend this as shared

clinical decision-making, they've published guidance on what are the things you should talk about when you're engaged in this type of a conversation, and that has not been provided, which then leads to confusion and disruption, and so it is causing irreparable harm now and it continues to multiply and escalate.

We went through the HepB action last time around, and it, quite frankly, in a way gets folded into the January 5 schedule change.

THE COURT:  Right.

MR. OH:  So this unexplained consistency -- inconsistency in how they went about making this -- those two votes without going through what had been the process, without publishing guidance, that's an APA violation.

And, again, there's just so many things that they just swept aside, didn't consider, which I think if -- that a functioning ACIP that is being consistent with its objective and mission would be doing, and they did not do that, no new data or studies.

And then there is just one point worth emphasizing. This strategy that they adopted, risk-based for HepB, it failed back in the '80s.  Why they're reverting back to that is beyond me.

And I'm a little bit at a loss on how the government can argue that Plaintiffs have no reliance interest because,

yes, vaccine recommendations can change, sure, but the reliance interest has been on a transparent, legitimate, structured evidence-based process.

So I was a little bit concerned last time around when you made the comment about how usually economic harm does not warrant preliminary injunctive relief.

But in a case where there's sovereign immunity, in a case where economic damages aren't recoverable, that's where economic harm qualifies as irreparable harm in APA cases, citing these cases, you'll have them now when I submit the PowerPoint.

And I think one of the best cases --

THE COURT:  Is that *California v. Kennedy* case -- I don't remember you -- is that discussed in your brief?

Am I just not remembering it?

MR. OH:  And if it isn't, our oversight.

THE COURT:  No.  No.  I -- there's a lot of briefing on this.  I very well could have missed it.  If you're going to submit the PowerPoint --

MR. OH:  Yes.

THE COURT:  -- I'll look it up from there.

MR. OH:  So when you are forcing pediatric practices in Crossville, Tennessee, to either -- or in Mount Clemens, Michigan, to either hire additional staff, set aside one person just to engage in shared clinical decision-making, you take up

the time and you add up the time through the course of a week, a month that goes uncompensated, the restructuring of their whole workflow, did they consider the impact on specific practices that a shared clinical decision-making recommendation would lead to?  There's no evidence of that.

And the ripple effects that come from an ACIP recommendation approved by the CDC, it's immediate.  And -- okay, yes, we did cite *California versus Kennedy* on page 46 of our brief.

And then, also, in this particular case, especially harm to the public is irreparable harm.  And these cases here stand and support that proposition.

So in terms of a correct legal standard to apply on irreparable harm, can you make a finding that economic harm in a case like this is sufficient to demonstrate irreparable harm? Yes.  Can you consider harm to the public as irreparable harm? Yes.

And so two other -- so since you are going to be -- it appears to be granting the motion for leave to file these supplemental declarations, what we did since -- well, over the weekend, again, was to go through all of the declarations and we've created a summary chart of declarant, ECF number, and then the particular quotes from their declarations specific to each agency action, the May '25 action, the September '25 vote, the December vote, and how each of those individually have

caused harm.

And I don't need to go -- I'm -- we submitted many declarations in this case, but, you know, we're the plaintiffs. We've got the burden, and so we need to -- and just because of the urgency of this, we wanted to provide you with as up-to-date possible evidence and facts for you to make a good decision, so we have -- we put in these new declarations and -- but it's a lot to wade through.  I know.  And you've -- I think this is not your only case.

THE COURT:  It is not.

So the summary exhibits, do you want to walk me through them now, or you want to say -- you want permission to submit them?

MR. OH:  I would like permission to submit them, Your Honor.

THE COURT:  Do you have any objection to him --

MR. OH:  I'll show them to him.

MR. BELFER:  We've never seen any of this.

THE COURT:  Share them with Mr. Belfer.  Mr. Belfer, I'll give you a chance to look at them.  I'm going to give you a chance to respond to their declarations.  Today's Wednesday. What is the -- the day we scheduled the ACIP meeting is the 23rd; is that correct?

MR. OH:  March 18th and 19th.

THE COURT:  Okay.  So I have sort of a -- I have a

hard deadline myself.  Why don't I say you provide that to Mr. -- you have it right now, you can provide it to him right now.

MR. OH:  Let the record reflect I'm handing a copy of the exhibit.

THE COURT:  And you'll e-mail him an electronic copy, so he can --

MR. OH:  Yes, that we would like to submit to the Court.

THE COURT:  Give it to the government.  Give Mr. Belfer an opportunity to object to it.  Mr. Belfer, if you don't object to it, let him know.  He can file it on the docket by the end of the day.

If you want to object to it, I'll give you until Monday to object to both of this and anything you want to submit in response to the declarations.  That gives you -- that doesn't give you an enormous amount of time, but we're under a very tight timeline here.

So if you have no objection, tell Mr. Oh.  He can submit that summary chart today.  If you do have an objection, you can make it along with supplying anything you want to supply in response to the declarations no later than Monday at 5 o'clock.  Does that -- am I giving you enough time to pull that off?

MR. BELFER:  Sure.  Thank you.

MR. OH:  So speaking of the next meeting, this is the last subject, then I'll be done.

THE COURT:  Okay.

MR. OH:  So I think it's a good thing to compare what they plan on talking about as announced in the Federal Register versus the last, what we would say, fulsome ACIP meeting that occurred was on April 15th of 2025.  We've already talked about that meeting where Dr. Havers, Schechter, Link-Gelles, and Panagiotakopoulos presented data on COVID.

And so a Federal Register notice was published very recently, and it said, "The agenda will include updates on ACIP work groups and discussions on COVID-19 vaccine injuries and long COVID and ACIP recommendation methodology.  Recommendation votes may be scheduled for COVID-19 vaccine injuries and long COVID and ACIP recommendation methodology."

One thing very striking about what they say is on the agenda is what's missing.  There's a big measles outbreak in South Carolina right now.  Why aren't they going to be talking about that?

Isn't that the job of the -- one thing that the ACIP can do, is they are supposed to be providing guidance to the CDC director to control and prevent communicable diseases, and they're not going to be talking about measles.

But then when you look at the agenda from a year ago, it's a very, very specific and substantive agenda to talk about

presentation on immunogenicity of the Mpox vaccine to the epidemiology and risk factors for COVID-19 hospitalizations vaccine effectiveness, the CMV, cytomegalovirus, vaccines -- I have no idea what that is -- CMV vaccine safety.

And here's the second day of that meeting, the agenda, they're actually talking about vaccines.  They're talking about risks and benefits of vaccines.

At this next meeting, it looks like all they're going to be talking about are risks and injury and how vaccines can hurt you.

That is inconsistent with the mission and objective of the ACIP.  That is the recipe for spreading more distrust and, dare I say, misinformation or disinformation about vaccines.

And it is entirely inconsistent with the charter, which Secretary Kennedy himself signed on December 3rd, where they are supposed to be advising on circumstances in which a vaccine or related agent is recommended.  They're supposed to deliberate on the use of vaccines to control disease in the U.S.

So this next meeting and the agenda that they have posted is entirely inconsistent with what the ACIP charter says they should be doing.

So for purposes of enjoining that next meeting, I think there are sufficient grounds; there's a meaningful standard for you to apply to justifiably enjoin that next

meeting from occurring.

So, like I said, their focus is all on harm.  There's no agenda item on benefits for this next meeting.

So thank you for letting me go over about six or seven minutes.

THE COURT:  Sure.

MR. OH:  I know that you -- if you give me any rebuttal, it will be just a little bit of time.

THE COURT:  I'll give you five minutes of rebuttal.  We're going to take a 10-minute break.  We'll come back at 10:25.

Mr. Belfer, I don't need you to spend a lot of your -- if you say Mr. Hughes got it all right, you needn't spend a lot of time on that issue.  Thank you.

THE CLERK:  All rise.

(The Honorable Court exited.)

(Brief break from 10:17 a.m. to 10:33 a.m.)

THE CLERK:  All rise.

(The Honorable Court entered.)

THE CLERK:  Please be seated.

THE COURT:  Thank you, all.

Mr. Belfer, you have the floor.

MR. BELFER:  Thank you, Your Honor.

So with regard to the new declarations, we do oppose those, and we'll file a response by Monday.

THE COURT:  Okay.  And if -- you're welcome to file a response by Monday, but also if you, in the alternative, want to file something in opposition to them, feel free to include that too.

I don't know what your thinking on that is and maybe you haven't read every page of 450 pages either, so go ahead and file your opposition.  I will look at your opposition.

If you also want to file something that says -- in response, I would like to file X, Y, and Z, you should feel free to do that too.

MR. BELFER:  Understood.

When we were last before this Court, we explained that Plaintiffs challenge to the January 2026 was ultimately about a policy dispute.  The same is true for Plaintiffs challenge to the May 2025 secretarial directive and the September and December ACIP recommendations.  Plaintiffs disagree with how the agency weighed the evidence regarding the COVID-19 and hepatitis B vaccines.

THE COURT:  I'm going to ask you to just slow down a little bit.

MR. BELFER:  Plaintiffs think the public health would be better served by a recommendation that everyone receive the vaccines, rather than the recommendation the agency chose, that people discuss those vaccines with their health care provider.

But the Administrative Procedure Act does not permit

Courts to reweigh the evidence or substitute their policy judgment for that of the agency.

Under our system of government, democratically accountable agencies, such as HHS, are entitled to make complex scientific determinations within their areas of expertise and to make policy judgments.

The Court's role is very limited.  It simply ensures the agency has reasonably considered the relevant issues and reasonably explained its decision.

Here, the agency has done that in spades.  The agency considered the vaccines' safety and efficacy as well as other factors such as the risks of the underlying diseases, public trust and confidence in vaccines, the impacts on insurance coverage, and the pros and cons of different types of recommendations.

In each case, the agency's decision was informed by scientific evidence and insight of experts in the field.  Now, Plaintiffs disagree with the agency's immunization recommendations, and that's fine.  They're free to express their disagreement and publish their own immunization schedules as they've done.

But the APA does not allow them to overturn the agency's reasonable policy judgments based on its reasonable consideration of the evidence, nor may they use the APA as a vehicle to effect broad programmatic changes to federal vaccine

policy.

And I think it's telling that in Plaintiffs' presentation, they said, well, in March, the agency should consider measles. What they want this Court to do is essentially supervise federal vaccine policy indefinitely, but that is not the role of a Court under the APA.

And, of course, we're here on a PI motion, and so it's important to keep that standard in mind. A preliminary injunction is an extraordinary remedy, and Plaintiffs have an especially high burden.

They must make a clear showing that they're likely to succeed on the merits, that they'll be irreparably harmed absent an injunction, and that the public interest favors the requested relief. Plaintiffs have not come close on any of those factors.

So I'd like to start with likelihood of success on the merits. And we'll begin with standing, and, you know, we incorporate our arguments from our first preliminary injunction opposition which apply equally here.

And there are a few additional deficiencies with regard to the May 2025 secretarial directive and the ACIP September and December votes.

In particular, none of those have any future effect. So to seek standing, to seek -- to have standing to seek prospective relief, such as an injunction, the plaintiff must

establish sufficient likelihood of future injury, and that is from the Supreme Court's *Alliance for Hippocratic Medicine* case.

And you assess standing as of the date the current operative complaint was filed, which is February 17th, 2026. As of that date, the directive in the September and December votes had no future effect.

That is because in January, CDC issued a new immunization schedule including recommendations for the COVID-19 and hepatitis B vaccines.

Now, it's true the January decision memorandum mentioned ACIP's recommendations for those vaccines for September and December, but that was just one fact among many that it mentioned.

The January recommendation was not at all contingent on ACIP's votes for September or December or CDC's adoption of those votes, and so the current operative schedule is from January 2026.

And, you know, even if the Court were to vacate the CDC's adoption of the ACIP votes in September and December, that would have no effect because the current schedule is from January.  That would remain in place.

And so there's no future injury from the actions challenged here.  There's no redressability because even vacating those actions would not change the current

recommendations.

THE COURT:  But what if the January schedule is vacated?

MR. BELFER:  If the January schedule is vacated, then it is true that the schedule would basically revert to before that, but, again, the Court analyzes standing as of when the current complaint was filed, so as of the filing of the fourth amended complaint, there was no future effect -- no future injury from the secretarial directive or the September or December ACIP votes.

And then another way to look at this is mootness. Because the January 2026 schedule has overtaken the actions from 2025, Plaintiffs lack any legally cognizable interest in the outcome of their challenges because an order of vacating those 2025 actions would not change the currently operative January 2026 schedule.

And so, you know, whether the Court looks at it from standing purposes or mootness, the fact remains that the actions challenged here, the directive and the September and December ACIP votes, have no future effect, and there's no future injury from them in light of the January 2026 schedule, and so as of when the complaint was filed in February, there's simply no standing.

Turning to the committed to agency discretion by law issue, so the APA in 5 U.S.C. 701(a)(2) expressly does not

apply where agency actions are committed to agency discretion by law, and that applies when the Court would have no meaningful standard against which to judge the agency's exercise of discretion, and that's from the First Circuit's *Union of Concerned Scientists* case.

Here, the relevant statutes, as we discussed, is 42 U.S.C. 243(a) which authorized the secretary to assist states and their political subdivisions in the prevention and suppression of communicable diseases and advise the several states on matters relating to the preservation and improvement of the public health.

From that statute, there's just this general authority to assist states in preventing communicable diseases and promoting public health, but there is no guidance as to how the agency should exercise its discretion, how it should help promote the public health.

To use the language of the First Circuit in *Union of Concerned Scientists*, there's no guidance in what the agency should consider about when and how to exercise that authority.

Now, in Plaintiffs' presentation, they said, well, agencies can constrain their own discretion, but here the agency has not adopted any rule, any -- any legally binding rule. There is no formal agency policy saying how the secretary should exercise its authority under Section 243(a), again, no binding rule, no formal agency policy, you know. All

Plaintiffs can point to is, well, there's this informal, kind of, internal ACIP process.

And they -- they admitted -- in discussing *Braidwood*, they admitted that ACIP is a -- is a purely advisory committee, which we agree on.  It is a purely advisory committee.

And so the internal operating procedure of a purely advisory committee which has no legal authority on its own, that is not anything that can bind the agency, and so that does not supply any requirements that the Court could use to evaluate the agency's exercise of its discretion.

And I would note the First Circuit's *Marasco & Nesselbush* case where it said "The Court needs a set of statutory or regulatory requirements to guide it in assessing the propriety of the challenged actions."

So it's not just is there -- can we find some internal process that may or may not have been followed.  It's was there a set of statutory or regulatory requirements to guide the Court in evaluating how the agency exercised its discretion, and here there are none.

So in short, the secretary has broad and unreviewable discretion under Section 243(a) to decide how to go about assisting and advising states in preventing communicable diseases and preserving the public health.  And so right off the bat, because this is committed to agency discretion the APA does not apply.

So let's turn to the arbitrary and capricious analysis.  And so to set the stage, you know, as the Court knows, this comes from 5 U.S.C., Section 706, and as the First Circuit held in the *District 4 Lodge* case, the Court has a very narrow role to play.

As the Supreme Court said in *Prometheus Radio Project*, the Court simply ensures the agency has acted in a zone of reasonableness, it has reasonably considered the relevant issues, and reasonably explained its decision.  If the agency action is supported by any rationale review of the record, it must be upheld.

The First Circuit made clear that a difference of opinion about how to evaluate the evidence has no place in arbitrary and capricious review, and as the Supreme Court held in *State Farm*, which Plaintiffs themselves cited, the Court cannot substitute its judgment for that of the agency.

Plaintiffs also mentioned the *Department of Commerce* case, and we agree that case is helpful, and Your Honor can review it.

What the *Department of Commerce* case said is that the secretary himself had authority to make policy.  He didn't need to defer to the census bureau.  The secretary himself was allowed to have policy preferences and to make policy himself.  That was the authority he had over the statute.

And so similarly here, the secretary has unreviewable

authority to -- to make vaccine recommendations and to assist states in promoting the public health.

Before we get into --

THE COURT:  Is it really -- is your position that it's totally unreviewable?  Meaning if the secretary said instead of getting a vaccine -- instead of getting a vaccine to prevent measles, I think you should get a shot that gives you measles; is that unreviewable?

MR. BELFER:  Yes.  There -- there is no -- there is no standard to apply to Section 243(a).  I mean, the secretary has --

THE COURT:  Well, it's promoting the public health; right?

MR. BELFER:  So the goal -- the secretary's goal under that statute is to help states promote the public health, but how he goes about doing that, what evidence he considers, what factors he considers, the process he goes through, all of those are committed to agency discretion.

There is no statutory or regulatory requirement that sets out how the secretary should go about promoting public health, so all we have is this general policy goal, this general goal of promoting public health.

But under the committed to agency discretion case law, what the Court looks to is whether there is a statutory or regulatory requirement that guides how the agency goes about

pursuing that general goal.

THE COURT:  So if the secretary says, I think a better way to get herd immunity on measles is for everyone to get measles, and so I'm now going to recommend that everybody go to their doctor and be exposed to measles, and then we're going to get herd immunity because everyone's going to get measles, that recommendation would be unreviewable.

MR. BELFER:  Yes.  I mean, if -- if the secretary were to decide -- certainly, he hasn't done this, but if --

THE COURT:  I know.  I'm not saying he did decide this.  Don't get me wrong, but I'm just trying to understand. Really you're saying that I -- the preamble about the goals of the -- you know, preventing and public health being the objective is so -- is so ambiguous that no decision made is reviewable under any circumstance.

MR. BELFER:  That's correct.

Now, I think something to keep in mind is there are checks on government outside of Article 3 Courts.

THE COURT:  Sure.

MR. BELFER:  So if the secretary were to do something that was not popular with Americans, you know, there's electoral, there's political accountability.

Courts are not designed to remedy every potential defect in agency decision-making, so the APA has a very specific role and where there are, kind of, broad statutory

goals, but there's no statutory or regulatory requirement that can guide Courts in evaluating how the agency goes about pursuing that goal, the APA simply does not apply. There might be other accountability mechanisms but not under the APA.

And so, you know, even if, for example, the Court -- if the secretary were to say, you know, under my judgment, I think that herd immunity is the best way, then, you know, that would be essentially unreviewable.

And, of course, here, what the secretary did is he said -- well, the secretary as well as, you know, CDC, they said, we think that the best way to promote public health is for people to talk to a health care provider about the COVID-19 and hepatitis B vaccines, you know.

Everyone here is trying to promote the public health. This isn't public health versus some other value. Everyone is trying to promote public health. There's just a difference in opinion as to how to go about promoting public health.

The secretary and the agency has decided to promote public health by recommending shared clinical decision-making, talk to a health care provider, and the secretary has decided to consult certain experts over others.

But, kind of, going back to the core point, there is no statutory or regulatory requirement that guides who the secretary consults, what factors he considers, how he weighs the evidence. All of those issues are committed to agency

discretion.

So let's turn to the first challenged action here, which is the May 2025 secretarial directive.  In Plaintiffs' presentation, they focused on that short video posted online.  They said, well, that video doesn't provide an adequate explanation.

But the explanation for the directive is not just from that particular social media post.  It's in the directive and in the two detailed scientific memoranda that support the directive as well as the rest of the record, which, of course, we haven't yet produced the full record.

But just based on what we have so far, the directive and those two memoranda from senior HHS officials, we see that there was a reasonable explanation and a reasonable consideration of the relevant factors.

And I will note that, you know, Plaintiffs said, well, we had no idea these memos existed.  The directive itself on its face says that the secretary considered recommendations from FDA and NIH, and so, you know, it's clear what it considered.

Plaintiffs in their -- in their presentation, they said, well, these memoranda were not from the ACIP or CDC, and they weren't shared with them, but there was no requirement that the secretary base the directive on the ACIP or from CDC, you know.

Again, Plaintiffs admitted that the ACIP is a purely advisory committee.  It simply exists to advise the secretary and the CDC director on vaccine recommendations.

There's no requirement that the secretary get his advice from any particular one of his employees.  The secretary has discretion to consult whichever of his employees he thinks is appropriate to advise him on his statutory authority, and so it was fully appropriate and within his statutory authority for the secretary to get advice from senior officials at FDA and NIH.

And so let's talk a little bit about those memos. With regard to children, the vaccination for children, the relevant scientific assessment is from Matthew Memoli, who is the principal deputy director of NIH, and Sarah Brenner, the principal deputy commissioner of FDA, both of whom are -- have medical degrees.

They -- those -- that memorandum evaluated Secretary Becerra's recommendation from June 2022 that all children receive the vaccine, and it found that after review of relevant existing data including 39 scientific references and new studies that were unavailable to Secretary Becerra in June 2022, that there was no clear evidence that the benefits of vaccination for COVID-19 outweigh the risk of harm in children under 18 years of age.

And in reaching that conclusion, they considered the

relative evidence.  For example, they considered the risks to children from COVID-19.  They considered mortality evidence. They considered hospitalization rates.

They also considered the risks of COVID-19 vaccination.  For example, they mentioned that vaccination can cause postvaccination myocarditis and pericarditis, seizures, Bell's palsy, transverse myelitis, clotting disorders, strokes, heart attacks, and acute kidney injury as well as non-COIVD-19 lower respiratory tract infection, so, again, those are all -- that's all evidence that the memorandum considered.

In addition to the risks of the vaccine, it considered the efficacy of the vaccine, and it found that the past and current true efficacy of the COVID-19 vaccines remains unclear.

It looked at the particular studies that had been done, and it said that in light of those studies, we still don't know enough about efficacy.

And so what the memorandum concluded is that the currently available data in published studies do not provide sufficient clinical and scientific evidence to broadly recommend COVID-19 vaccination for those under 18 years of age; rather given the low risk of infection to those under age of 18, the known risks of vaccination outweigh any small potential benefit.

And so what you see in the memorandum is that there was a detailed analysis of the evidence.  They looked at the

studies that were out there.  They weighed the risks and benefits, and they reached a reasoned conclusion in light of their evaluation of the evidence.

And then similarly, regarding the recommendation for pregnant women, this was based on a scientific assessment from Tracy Beth Hoeg, M.D., Ph.D., who is an advisor to the FDA commissioner.

Like the other memorandum, this cited multiple scientific references.  It considered safety risks, finding that there was a lack of high-quality data of the safety of mRNA vaccines during pregnancy.

In particular, it noted that Pfizer and Moderna lack high-quality randomized trial safety data.  There was only one insufficiently powered, i.e. very small, randomized study of the Pfizer vaccine, and no randomized trial for pregnant women for the Moderna vaccine.

In other words, this memorandum looked at the particular studies that were available.  It did a detailed analysis of the available evidence, and it considered the reliability and the quality of the existing scientific evidence.  Those are areas about which the Court needs to defer to the expert judgment of the agency.

So in addition to looking at data about safety, it also looked at efficacy.  It found that the current benefit of these vaccines against severe disease is uncertain given the

widespread immunity from prior infection and a lack of randomized placebo-controlled trials looking at clinical outcomes in this setting.

And the memo further found that vaccine efficacy in our current circumstances has been deduced from observational data and immunobridging data and the applicability of the initial randomized controlled trials to today's epidemiological circumstances in a population that has been exposed to the SARS-CoV-2 virus is not well defined.

Again, the memo is doing an in-depth look at the particular evidence that's out there, it's -- and analyzing the quality and reliability of the scientific studies in making a reasoned conclusion based on that.

So in light of the lack of high-quality data demonstrating the safety of the vaccines as well as concern about efficacy, the memo reached its conclusion, and the secretary reasonably relied on those memoranda.

And, you know, the case law is clear.  The secretary is entitled to rely on the opinions of his own experts, so here the secretary reasonably relied on the memoranda from senior officials with sterling credentials from FDA to NIH to reach the conclusions in the directive.

And, you know, I think it's especially helpful to look at the case law holding -- you know, for example, the *Baltimore Gas and Electric* case from the Supreme Court.  The Court should

be at its most deferential when the agency makes scientific determinations within the agency's area of special expertise.

And then, you know, in the recent *Novartis* case in the D.C. Circuit, there the Court deferred to FDA because its analysis turned on the FDA's expertise in evaluating the clinical significance of drug studies which will not likely second guess.

And, then, of course, the D.C. Circuit in the *Rempfer* case afforded a high level of deference to FDA's scientific judgment within its area of expertise.

So in light of the agency's detailed scientific analysis in these two memoranda and the secretary's reasonable reliance on that scientific analysis, the agency has plainly met the reasonableness requirement under the arbitrary and capricious standard.

You know, Plaintiffs make a variety of arguments. They say that the agency did not consider new data, but that's simply not true.  They considered data from 2024 and 2025 in both of those assessments.  But, of course, they didn't need to.  There's no requirement to consider new data, but they did so anyway.

And, you know, they say that these memoranda are inconsistent with data showing the risks of COVID-19, but, again, no one is questioning that COVID-19 has risks.  Instead, they're looking at the risk of COVID-19 as well as safety and

efficacy data for the vaccines and considering all of that to reach the reasonable conclusions that they did.

Plaintiffs say that the directive did not rely on an ACIP vote, and they say that was somehow improper, but, again, under Section 243(a), the secretary had wide and indeed unreviewable discretion about what to consider, what evidence to consider, what factors to consider, who to consult in exercising his authority under Section 243(a).

There was no requirement to base the directive on ACIP. Again, ACIP is purely advisory, and it exists solely to advise the secretary to the extent that he needs advice in exercising his statutory functions.

And, you know, notably in the previous PI hearing, Plaintiffs conceded there have been at least three examples in the past where CDC has deviated from ACIP recommendations, so not only is basing recommendations on ACIP not required, there's not even a uniform practice. There are examples where the agency has deviated based on the agency's own policy judgment and review of the evidence.

THE COURT: On those three occasions, they had had a recommendation. They just didn't follow it; right?

MR. BELFER: That's true. They decided not to follow an ACIP recommendation, but there's no meaningful difference between that and making a recommendation without ACIP going first.

I mean, what's true in both examples is that the agency is saying we are not going to follow ACIP.  We're going to make our own decision about vaccine recommendations based on our own analysis of the evidence.  In both cases, that's fully within their authority.  There's no requirement that the vaccine recommendations be based on ACIP votes.

You know, Plaintiffs also talk about reliance interests, and, you know, we explain in our brief why vaccine recommendations change all the time.  There's no reliance interest in any one vaccine recommendation staying in place forever.

What Plaintiffs said today is, well, our reliance interests are actually in the process, you know.  They say, we have a reliance interest in ACIP's decision-making process.

But what the case law says is that under the arbitrary and capricious standard, agencies -- agencies have to consider reasonable reliance in the agency's positions, so if an agency changes a rule or changes some official policy, like the regular reliance interest in that rule or official policy that you have to consider, but the case law does not support this notion that you might have reliance interests in some, kind of, internal operating procedure for an advisory committee.  There was no reliance interest in ACIP's, kind of, internal operating procedures.

And, you know, there were no -- there were no policies

here, no rules, no binding policies that weren't followed.  The only change is that we made these recommendations without going through the ACIP's process, but, again, there are no reliance interests in ACIP's internal operating procedures.

Okay.  And so I think we can turn to the September and December votes.  I think with regard to FACA, you know, we addressed FACA in our prior briefing and at the last PI hearing, so I don't think we need to get into it now.

With regard to *Braidwood*, we agree with Plaintiffs that *Braidwood* does not apply here, that FACA does apply to the ACIP, and we'll explain that more fully when we submit our brief tomorrow.

THE COURT:  Thank you.

MR. BELFER:  And then, you know, we'll also -- you know, we'll respond to the new declarations on Monday.

One other point, before I get into the September and December votes, Plaintiffs criticized the announcement in the Federal Register about the March ACIP meeting, and they compared that Federal Register announcement to the agendas for prior ACIP meetings, but that's comparing apples to oranges.

It is true that the March meeting has been announced, but the full agenda for the March meeting has not been released, so we don't yet have a full agenda, and so, you know, we don't -- we just don't know everything that they're going to talk about in March.  It will be released, but it hasn't been

released yet.

So let's -- let's talk about the September and December meetings. And so, you know, we go through in detail what was discussed at these meetings in our briefs. We don't need to go through all that now.

But just at a high level, in September that's where they considered the COVID-19 recommendations. The September meeting involved numerous scientific presentations about the COVID-19 vaccine from experts in the field including CDC subject matter experts and members of ACIP's COVID-19 immunization work group.

Plaintiffs said today that ACIP did not consider the work group. That's simply untrue. There were presentations from the COVID-19 work group at the September meeting.

So, you know, there were presentations on COVID-19 epidemiology from CDC, on COVID-19 vaccine implementation, on vaccine effectiveness, so, you know, there were multiple presentations on vaccine safety and effectiveness from relevant experts. There was a presentation on safety from the work group, actually, multiple presentations from the work group on safety.

And so what you have from this meeting is you have multiple presentations from the work group, from other scientific experts on vaccine safety and efficacy, other relevant considerations.

And in addition to the presentations, there was discussion at the meeting about safety and efficacy and considerations into trust and public confidence.

They also discussed the proposal to recommend shared clinical decision-making, and there were discussions about the benefits and disadvantages of a shared clinical decision-making recommendation.

So they really considered all relevant factors. They also considered insurance coverage, you know, noting that there would be no loss to insurance coverage under this recommendation.

And so in light of all of that discussion and engagement with the evidence, engagement with the science and the evidence and advice from experts, ACIP reached a reasonable recommendation to recommend shared clinical decision-making.

And then in October, the CDC adopted that recommendation. It explained that the prior recommendation that everyone get the COVID-19 vaccines had deterred health care providers from talking about the risks and benefits of vaccination for the individual patient or parent, and it noted vaccine uptake concerns, that only 23 percent of adults had followed the most recent seasonal COVID-19 recommendation and that there were widespread risk-benefit concerns about booster shots.

So in light of those concerns as well as the ACIP's,

you know, reasonable recommendation, CDC adopted the recommendation to recommend shared clinical decision-making.

What you can see from all of this is that, you know, this is not some, you know, arbitrary process. This is a careful, deliberative process where ACIP considered scientific evidence. It heard from experts. It heard from the work group.

And CDC considered the ACIP's deliberations. It considered safety and efficacy concerns, vaccine uptake concerns, and it reached a reasoned conclusion to recommend shared clinical decision-making.

You know, Plaintiffs say that ACIP should have followed the GRADE or EtR frameworks, but there was no requirement to do that. There was simply, kind of, a best practice that ACIP had adopted in the past, but, again, there is no -- there's no requirement that ACIP, which is, again, is a purely advisory committee, there was no requirement that they follow any particular process in evaluating evidence, and so there -- there was no requirement and there was no need to explain why they adopted a different process, you know.

They had to -- ACIP, as an advisory committee, had discretion about how they evaluated evidence, and the Court should defer to ACIP's expert analysis of the evidence.

And we'd also note that, you know, even if there were any failure to follow the EtR or GRADE frameworks, that would

be harmless because, you know, again, Plaintiffs are not challenging the ACIP recommendations themselves.  What Plaintiffs are challenging is CDC's adoption of ACIP's recommendation.

And, you know, the secretary, and by extension CDC, have wide and unlimited discretion in adopting vaccine recommendations, so they are not limited by which processes ACIP did or didn't follow.  They have full discretion about which vaccine recommendations to adopt.

And so even if there were some kind of procedural default, some failure to follow some process within ACIP, any -- you know, which procedures ACIP followed internally don't create any arbitrary and capricious problem for the ultimate decision by CDC and the secretary to adopt vaccine recommendations.

And, you know, again, Plaintiffs say there's a failure to consider new data, but we did consider new data.  If you look at the record of the September meeting, they did consider 2024 and 2025 data.

So just as the September meeting was reasonable and reasonably explained, so for the December meeting.  This meeting considered the hepatitis B vaccine recommendations, and it recommended shared clinical decision-making for parents deciding whether to give the hepatitis B vaccine, including the birth dose, to infants born to women who tested negative for

the virus.  On the other hand, for -- it had a different recommendation if you tested positive, but if the mother tests negative, it recommended shared clinical decision-making.

And it noted risks to consider.  It said, "Parents and health care providers should consider whether there are infection with risks, such as a household member who has hepatitis B or frequent contact with persons who have emigrated from areas where hepatitis B is common."

And so, you know, the agency made the recommendation. They said, here's some risk factors to consider, and that was based on a reasoned scientific analysis.

If you look at the December ACIP meeting and you look at the presentations at that meeting, you can see ACIP received multiple scientific presentations from CDC, from the Centers for Medicare and Medicaid Services or CMS and the child adolescent scheduled work group.

Plaintiffs say that we didn't consider the work group. That's false.  The December ACIP meeting did involve presentations from the work group.

So if you look at the presentations, they analyzed safety.  They analyzed efficacy.  They analyzed insurance coverage.  They looked at the work group's process for making this recommendation.

And in particular, the second presentation from Dr. Pebsworth is worth looking at because that goes through the

work group's process.  It noted that between October 17th and November 24th of 2025, the childhood and adolescent schedule work group received 12 presentations by CDC staff, work group members, and invited ad hoc experts that covered clinical ethics, non-specific vaccination effects, aluminum adjuvant exposures, clinical practice challenges and solutions, and the Alaska hepatitis B vaccine trials.

There was a thorough work group process that led to the presentations at the December meeting.  And Dr. Pebsworth reported the work group's findings regarding safety and efficacy and, you know, the need for the vaccine.

And they ultimately recommended shared clinical decision-making because it provided a return to decision-making to parents in collaboration with the health care provider and the providers to recommend a flexible schedule and tailor care to individual needs, risks, and preferences.  It considered safety and efficacy and all the relevant factors.

And then CDC ultimately adopted ACIP's recommendation. It explained that the recommendations reflect ACIP's rigorous review of available evidence and restored the balance of informed consent to parents whose newborns face little risk of contracting hepatitis B.  And that's from CDC's announcement of its decision to adopt ACIP's recommendation.

CDC also noted very low incidents of perinatal hepatitis B transmission in the U.S. due to existing prevention

systems and the high reliability of prenatal hepatitis B screening which identifies nearly all hepatitis B infections during pregnancy, so, again, the CDC considered all of these scientific factors and made a reasoned conclusion.

They also explained that they would develop materials to support clinicians in discussing vaccination timing with families, so, you know, Plaintiffs say, well, we don't have enough guidance to consider, but, again, CDC said they would --

THE COURT:  Slow down.

MR. BELFER:  -- CDC said they would provide materials. And I would note there is no requirement that CDC provide any sort of public guidance regarding the recommendations.  There was no failure to follow any requirement.

Nonetheless, in December, CDC said they would be providing guidance to clinicians about how to follow this recommendation, so the December vote, just like the September one, was reasonable and reasonably explained.

THE COURT:  Why if the -- if the ACIP had had a policy that they would follow the GRADE and the EtR framework and then they choose not to and don't explain why not, how is that not arbitrary?

MR. BELFER:  So there is no --

THE COURT:  They didn't explain why not; right?

MR. BELFER:  I'm not aware of an explanation of why they didn't follow that.

THE COURT:  And that had been the practice for many years before; right?

MR. BELFER:  So they -- they had followed that practice in the past.  I'm not sure if they followed it every single time.  If I knew -- at least in some cases, yes, they did follow GRADE and EtR, but there was no -- there was no binding rule.  There was no formal agency policy that required them to follow the GRADE and EtR process.

Again, ACIP is a purely advisory committee, and so the internal procedures they choose to follow in evaluating evidence are not binding.

THE COURT:  Okay.  That's what I thought the argument you were making was.  I wanted to make sure I understood.

So assume, for the sake of argument, ACIP says, the way we're going to consider about change in a vaccine schedule is we're going to look at the effectiveness of the vaccine in Step A.  We're going to look at the negative effects in Step B.  We're going to send it to a subcommittee for study on Step 3.  We're going to compare it to the -- whatever.  They've laid out, we're going to do these 10 things; that's how we're going to make our recommendation.

And then they come in to have a meeting, and they're, like, actually, today we're not doing any of those things.  We're just doing thumbs-up, thumps-down.  Who thinks we should recommend this vaccine?

Does the fact that the previous, let's say, 10 years they followed this protocol, and then they just -- this particular meeting they're like, we're not following it, is that reviewable under the APA here, or is your position that it doesn't matter what ACIP did since the final decision-making authority came out of the CDC?

MR. BELFER:  So we -- we continue to believe that these decisions are unreviewable, and that's so -- for several reasons.

THE COURT:  Well, right.  So I understand your position.  That wasn't quite what I was getting at.  I understand you're saying it's committed to agency discretion. I can't review it.

But assume that I can -- putting that aside, the final recommendation, if the ACIP itself has behaved in a way that is inconsistent with its past practice, is that reviewable at all, such that the ACIP recommendation is suspect because it hasn't been subject to the same rigorous protocol its prior recommendations had been, or is basically everything that ACIP does not subject to judicial review at all?

MR. BELFER:  Right.  So the mere fact that in the past ACIP might have followed certain procedures to evaluate evidence and did not -- did not follow -- excuse me --

THE COURT:  Sure.

MR. BELFER:  Get some water.

So the mere fact that ACIP followed certain procedures to evaluate the evidence in the past and did not follow those procedures going -- you know, in the current meeting, that is not by itself an APA violation.

The, you know, cases that talk about an agency, kind of, change in position, that's talking about if the agency has, kind of, a binding rule that it changes; there's some official formal policy that's being changed.

Here, there was no binding rule.  There was no formal agency policy that was being changed, all you have is ACIP, a purely voluntary -- a purely advisory committee changing its internal practices for how it looks at the evidence.

And so the mere fact that an advisory committee like ACIP changes its internal processes for evaluating the evidence, that change does not by itself create an APA violation.

Now, the Court, you know, still will review -- assuming it can review, the Court can look at whether the agency decision as a whole is arbitrary and capricious, so you can say, well, did the agency consider the relevant factors? Did it reasonably explain its decision?  The Court can do that.

But the mere fact that the ACIP, this purely advisory committee, changed its internal processes for evaluating evidence, that change by itself is not an APA violation.

THE COURT:  Okay.  Thanks.

MR. BELFER:  So what the record shows is that both in September and in December, the ACIP considered the scientific evidence.  They heard from the work group.  They heard from other subject matter experts.

They considered the vaccine's safety and efficacy, impacts on insurance coverage, the advantages and disadvantages of a shared clinical decision-making recommendation.  They considered all of that, and they reasonably explained the recommendations.

And, of course, the CDC was entitled to rely on the expert advice of its own experts in making the CDC's ultimate recommendation, and, of course, given all of this involves complex scientific questions within the agency's area of expertise, including how to evaluate scientific studies, studies' reliability and equivalent, those are all highly technical scientific questions about which the agency has expertise and the Court should defer to the agency.

And I would also note that the agency did consider new data.  They considered data from 2024 and 2025, and the work group in particular received 12 expert presentations on medical and scientific issues at its meetings in October, November 2025.  So for all of those reasons, the challenged actions were reasonable and reasonably explained.

We'll finally turn to the irreparable harm and public interest factors.  Plaintiffs said that you can have

irreparable harm simply from harm to the public, but that's not true.

Under binding precedent, the Court has to find irreparable harm to the plaintiffs in particular, and here they haven't shown that.

We incorporate our arguments from our first brief and our first argument, but something to note for these acts in particular is that Plaintiffs don't explain how each challenged action caused harm to these Plaintiffs in particular.  They lump everything together.  They use these general labels, like, the ACIP actions, the non-ACIP actions, but that doesn't suffice.

Each action has its own subject and effect, and Plaintiffs have to show when each challenged action will irreparably harm them in the time between now and final judgment, and they have not met that standard.

And then with regard to the public interest, Plaintiffs try to frame this case as, you know, the public interest is on their side and the government is on a different side.

But everyone here, Plaintiffs as well as the government, everyone is pursuing the same goal, which is promoting the public health.  That's what we're all trying to do.  We disagree about how to get there, but we're all trying to pursue the public health.

So the question here is who is entitled, under our system of government, to make vaccine recommendations, to evaluate the evidence, and to make these policy calls?  And the answer is HHS and CDC.

You know, Plaintiffs are trying to substitute their preferred policies for those adopted by senior democratically accountable federal officials in the Department of Health and Human Services, but Congress directed the secretary of HHS, not the plaintiffs, to assist states in preventing communicable diseases and promoting the public health.

Congress also authorized the secretary to establish the ACIP to advise the CDC director regarding vaccines and related agents for effective control of vaccine-preventable diseases.

So under the system established by Congress, the ACIP, the CDC director, and the secretary are entitled to -- sorry -- they're entrusted with the responsibility to make vaccine recommendations.  They have authority to evaluate the evidence and to determine which vaccine recommendations best promote the public health.

So this is not, you know, public health versus some other value.  This is we're all trying to promote the public health, and the question is who is entitled to evaluate the evidence and make vaccine policy including vaccine recommendations under our system of government?

And under the system Congress established, the responsibility and the authority for evaluating scientific evidence and making vaccine recommendations based on that review of the evidence, that falls to the government, to the secretary, and to the CDC.

And, you know, again, I would also note there are First Amendment values here.  Plaintiffs are trying to force the government to make a recommendation that we don't believe in.

But under -- you know, for example, the Supreme Court's *NRA v. Vullo* case, the government must remain free to select the views that they want to express about vaccine -- views they want to express, which also applies to vaccine recommendations.  They can share their views in the hopes of persuading others to follow their lead.

And so we have the authority, and under the First Amendment, we have the right to express our views about what vaccine recommendations best promote the public health.

And then, finally, you know, Plaintiffs talk about confusion, but really the injunction they asked for would just create more confusion.  They're basically asking the Court to -- to go back to the vaccine recommendations from a year ago, and then that might potentially change based on the final decision in this case and on appeal.  So this kind of flip-flopping between vaccine recommendations is not conducive

to the consistency and the public trust that Plaintiffs claim to want.

Ultimately, what this case boils down to is that there's a dispute about the best way to promote public health, which vaccine recommendations best promote public health.

And what we've shown is that the ACIP and the CDC have reached a reasonable conclusion based on the evidence about vaccine recommendations.

Plaintiffs might disagree with those recommendations, but ultimately, the government has the authority to weigh the evidence and to make the recommendations that the democratically accountable officials believe best promote public health.  That's what we've done here.  And so for all of those reasons the requested relief is not warranted.

THE COURT:  Thank you, Mr. Belfer.

Mr. Oh, a brief response.

MR. OH:  I'd like to start this rebuttal with the notion that the secretary's discretion is totally unfettered and not subject to judicial review; that is not consistent with the case law, and, quite frankly, I think, a decision adopting the position that the government would want to take -- wants the Court to take would make bad law.

And you asked the question, Your Honor, about the ACIP following GRADE or EtR, is there -- you know, can they just jettison that?

And I mentioned this case earlier today, and I want to quote a passage from *INS versus Yang*, 519 U.S., and this is at page 32, it's a unanimous opinion written by Justice Scalia, though the agency's discretion is unfettered at the outset, if it announces and follows by rule or by subtle course of adjudication a general policy by which its exercise of discretion will be governed an irrational departure from that policy, paren, as opposed to an avowed altercation to it, closed paren, could constitute action that must be overturned as, quote, arbitrary and capricious or an abuse of discretion, end of quote, within the meaning of the Administrative Procedure Act.

So in terms of we've got law here.  We've got regulation.  We have charter.  We have membership balance plan. We have a charter that Secretary Kennedy signed on December 3rd of last year where he basically agreed to be fettered to a certain extent.

And by engaging in a unilateral decision that bypasses a general policy by which its exercise of discretion will be governed, that is a violation of the APA, Your Honor.

And then, with regard to the -- I think *Union of Concerned Scientists* is also directly on point and addresses this issue.  And in that case, at pages 18 and 19, 954 F.3rd, this is about whether FACA furnishes any meaningful standards.

And we disagree with the EPA -- this is what the First

Circuit said, quote, We disagree with the EPA that Courts are not well equipped to enforce at least the outer boundary arranges of this type, nor does the fact that the statute leaves a great deal of discretion to the agency make actions taken pursuant to it unreviewable, citing *Weyerhaeuser* 139 Supreme Court at 370, and the parenthetical is, quote, A Court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable.

And it is rudimentary administrative law that discretion as to substance of the ultimate decision does not confer discretion to ignore the required procedures of decision-making.

So with regard to the government's argument that we relied on our own experts and we're simply disagreeing with the policy decision that they made, we're not going into the substance of the Memoli/Brenner May 12th memo now or the Hoeg memo of May 12th now.

I, quite frankly, think it's going to be easy to pick apart those memos at the right time, but the point here is that the process that they followed in making that change to the CDC schedule and bypassing the ACIP is what is the issue here at this stage of the case.

And so it's simply a -- I think, a red herring, an absolute red herring to rely on, let's say, 243(a).  If you look at where that particular statutory section falls in

42 U.S.C., it is a section on federal state cooperation, and then 243(a) goes into how the feds and the states can cooperate in terms of controlling vaccine-preventable diseases. That's -- that statute is really not the source of what Your Honor should really be looking at.

What has been, I think, established through an abundance of evidence is that there has been agreed-to fetters and constraints that the secretary recognizes, by his own signature on the charter, that this is a process and procedure by which vaccine recommendations should be made, but then a month after he actually signs that charter, he totally disregards it without explanation.

That is the action of a -- what's the right word to describe it?  It's the action of, I guess, someone who believes that he can do whatever he wants whenever he wants and he can regard process here and then disregard process there.  That is not what the APA allows or requires.

I'd also like to note that -- I do want to direct the Court's attention to one other case --

THE COURT:  Okay.

MR. OH:  -- involving some pretty scientific and complex questions of whether or not to ban a certain chemical on food crops.  It is *Red River Valley Sugarbeet Growers Association versus Regan*, 85 F.4th 881, Eighth Circuit 2023. And that case held that the EPA's decision to ban chlorpyrifos,

C-H-L-O-R-P-Y-R-I-F-O-S, on food crop without considering other options was arbitrary and capricious because the decision was not based on, for example, new findings, and, thus, the EPA failed to consider important aspects of the problem.

At this stage of the case, we are not asking the Court to delve into substantive scientific questions or the credibility of the memos.

We are asking the Court to look at what is and has been the procedure and processes that the secretary and his predecessors have all agreed and admitted that they should follow, and that hasn't been done here, Your Honor.

And the injury and the irreparable harm that flows from that -- I didn't have the time this morning to go through all of the declarations that show for each specific action what irreparable injury is flowing from them, and it has been happening since May of last year.  There has been a moving target that we've been trying to just get the target to stop moving.

But there's -- the declarations and the exhibit that we intend to submit to the Court demonstrates irreparable injury flowing from each individual action, but then we can't forget there is a cumulative effect that's been happening from May to this point.

And so I'm going to take one second here because she is handing me a cryptic note that I don't understand.

So the government brought up the previous examples where the CDC didn't follow ACIP recommendations, but in those previous examples, it either expanded recommendations or addressed safety issues discovered through post-marketing surveillance through the GRADE and EtR process, through careful evaluation of the evidence and the data.  They followed transparent, structured, evidence-based decision-making process and arrived at a recommendation.

And that is, quite frankly, all that the plaintiffs are asking, is if you're not going to follow this process that has been in place, that has been -- that Congress has saw fit to incorporate into 13 different statutes where they believed -- Congress believed that the ACIP could be trusted, then the government's failure to follow that trusted process upon which Congress has incorporated into many different statutes and then state and local jurisdictions around the country have also, 600 different statutes from around the country, when you're going to upset the apple cart like that, then give us a reasoned, rational explanation that is in accordance with law, that is absolutely reviewable, and once you get past that, Your Honor, then the evidence is very strong that we are likely to succeed on the merits.

And Your Honor, I implore you to grant our motion for preliminary injunction, vacate the January 5 schedule change, enjoin the next ACIP meeting, and let's get the administrative

record.  I'll be interested to see if there's anything more in the administrative record on the secretarial directive from May than those two memos, and let's preserve the status quo and get to a decision on the merits as quickly as we can.  So thank you, Your Honor.

THE COURT:  Thank you, Mr. Oh.

Mr. Belfer, I'll give you the last word.

MR. BELFER:  Thank you, Your Honor.

Plaintiffs said that Section 243(a) is a red herring. It is not a red herring.  That is the relevant statute that grants the agency authority here to make vaccine recommendations, so far from a red herring, that is what the Court should focus on.

The Court should look at the text of Section 243(a) and ask whether there are any requirements in that statute to guide the Court in evaluating the agency's exercise of discretion, and there simply are no rules, no requirements to guide the agency in exercising its discretion.

The agency is not required to base its recommendations on ACIP votes.  That is one way to make vaccine recommendations, but there is no requirement that vaccine recommendations must be based on an ACIP vote.

Similarly, ACIP's internal operating procedures, the internal procedures of a purely advisory committee are not binding on the agency.

And so for all of Plaintiffs talk of process, they have not identified a single statute or regulation or any binding policy that sets any process the agency did not follow here.

Instead, what the record shows is the agency reasonably considered the relevant issues and reasonably explained its decision, which is all the APA requires.

THE COURT:  Thank you, Mr. Belfer.

MR. OH:  Your Honor, may I just say two things in less than a minute?

THE COURT:  Less than a minute.

MR. OH:  The government's argument that 243(a) sets forth no requirements is the wrong standard.  Does 243 -- if Your Honor thinks it's relevant, is there meaningful standards to be applied?  And there are two phrases in that statute where you can meaningfully apply that to the ACIP process.

Okay.  And in terms of requirements that the ACIP process be followed, there's no statute that says, well, I think there's the APA; the Administrative Procedure Act provides constraints and some guardrails on agency actions that are reviewable, and that statute provides the basis for reliance interests to be developed and for my clients to put their trust into a process.

And when that process is being jettisoned for no good reason, then a reasonable explanation needs to be given that is

consistent with the evidence, and that just hasn't been done here.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Oh.

Mr. Oh, is this Mr. -- is it Mr. Jaffe in the back?

MR. JAFFE:  Yes, sir.

THE COURT:  Mr. Jaffe, I'm sure you're aware.  I denied your motion to intervene, but I invited you to file an amicus brief.  Is that something you intend to do?

MR. JAFFE:  I do, and with the Court's permission, I was planning on filing it on Monday along with all the other filings, if that's appropriate.

THE COURT:  You're one step ahead of me.  That was what I was going to ask, if you could get it in by Monday.  You're aware of the expedited time schedule we have to consider this.

MR. JAFFE:  I am aware, and I will comply.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Jaffe.

Thank you, Mr. Oh.  Thank you, Mr. Belfer.  I appreciate the argument, and I'll look at the briefing.  Everyone have a good day.

THE CLERK:  All rise.

(The Honorable Court exited.)

(Adjourned at 11:41 a.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

I, Jennifer M. Vaillancourt, do hereby certify that the foregoing is a correct transcript from the record of proceedings taken on March 4, 2026, in the above-entitled matter to the best of my knowledge, skill, and ability.

/s/ Jennifer M. Vaillancourt_      11th day of March, 2026

Jennifer M. Vaillancourt, RPR, CSR          Date
Official Court Reporter