Docusign Envelope ID: 253B1E99-C940-4D99-9001-5BB46A3AB720

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ACADEMY OF PEDIATRICS, *et al.*, <br><br> *Plaintiffs,* <br><br> vs. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the Department of Health and Human Services, *et al.*, <br><br> *Defendants.* | Case No. 1:25-cv-11916 <br><br> **LEAVE TO FILE GRANTED ON MARCH 13, 2026** |

### SECOND SUPPLEMENTAL DECLARATION OF SUZANNE BERMAN, M.D.

I, Suzanne Berman, M.D., declare pursuant to 28 U.S.C. § 1746 that the following is true and correct and within my personal knowledge.

1. I make this declaration based on personal knowledge and if called as a witness, I could and would testify competently to the statements contained herein. I am over the age of 18. I previously submitted a declaration in support of Plaintiffs' Fourth Amended Complaint and Motion for Preliminary Injunction describing the immediate harms resulting from Defendants' challenged agency actions. This supplemental declaration updates the Court on the ongoing, escalating, and compounding harms to my practice arising from: (1) the May 19, 2025 Directive issued by Secretary Robert F. Kennedy, Jr., reclassifying pediatric Covid-19 vaccination as "Shared Clinical Decision-Making" ("SCDM") (the "May 19 Directive"); (2) the June, September, and December 2025 ACIP (the "ACIP Actions") actions altering the CDC immunization schedule without adherence to the GRADE and Evidence-to-Recommendation ("EtR") framework; and (3) the January 5, 2026 revised CDC Childhood Immunization Schedule and accompanying decision

documents (the "January 5 Schedule Change"). These actions have and continue to destabilize vaccine delivery in my practice and community, impair the physician-patient relationship, materially increase uncompensated labor, create direct and imminent financial exposure for my practice, and force operational changes that cannot easily be reversed.

2.      I co-own Plateau Pediatrics in Crossville, Tennessee. I oversee the business, compliance, and operational aspects of the practice. Approximately 70–75% of my pediatric patients are insured through Medicaid. The financial stability of my practice depends heavily on the Vaccines for Children ("VFC") program and Medicaid reimbursement structures, which rely on the CDC childhood immunization schedule recommendations. I am a current member of the American Academy of Pediatrics (AAP).

3.      Since the May 19 Directive downgraded pediatric Covid-19 vaccination to SCDM, vaccine counseling time with my patients and their parents has increased substantially, which is an ongoing strain on the operations of my practice. SCDM requires individualized, documented discussions. These conversations frequently add 10 minutes to each patient visit and are rarely reimbursed. The time spent engaging in SCDM is not separately reimbursable, and generally SCDM counseling cannot be reimbursed if the patient declines vaccination. Although there are new CPT codes that allow us to bill for this type of discussion, only one insurer is paying for them so far and even then, they are only reimbursing these codes 8% of the time if the patient declines vaccination. As a result, my colleagues and I are spending increasingly more time counseling patients and their parents and performing work that is uncompensated as a result of the May 19 Directive and January 5 childhood schedules changes of childhood vaccines from routine to SCDM. This extra time aggregates and amounts to significant time for which my colleagues and I do not receive compensation, which we cannot later recover.

4. The May 19 Directive also caused and continues to cause significant administrative burden on my practice. For example, because of the lack of a universal definition for SCDM, our practice had to discuss this during weekly administration meetings to determine the meaning of SCDM and develop a standard protocol for our practice. This in turn led to the development of written practice guidance to assist clinicians on navigating these encounters. We have also had to dedicate additional time to training staff, creating new consent forms, and finding and updating resources for clinicians. Overall, the adoption of SCDM has proved very disruptive to our practice and our ability to provide care, vaccinations, and treatment to our patients. The time spent our staff has spent and continues to spend on developing new workflow, protocols, and guidance as a result of the May Directive and January 5 changes to the CDC childhood immunization schedule from routine recommendations to SCDM is not something our practice can recover later on.

5. Because SCDM counseling consumes appointment time, our pediatricians must either shorten discussions about other medical issues or see fewer patients per day. Both options result in lost revenue and reduced access to care. Many parents now refuse to engage in SCDM discussions altogether. If they do engage with us, they frequently cite distrust in medical experts and confusion due to the messaging on childhood vaccines by the CDC, ACIP, and Secretary. I, along with other pediatricians in my practice, therefore, continue to be placed in an untenable position: either push the discussion and escalate conflict or move on and risk professional liability exposure for failing to satisfy SCDM expectations now required by May Directive and January 5 Childhood Schedule Change.

6. My colleagues and I continue to have to address the Secretary, CDC, and ACIP changes to the childhood immunization schedule in real time, every day, with the patients and parents in my practice; the increased questioning from parents and time spent during a wellness

visit on previously routine vaccination counseling, continues to directly impact the operations of my practice, staffing, finances, and relationship with our patients. Each change to the CDC immunization schedule for children by the Secretary, CDC Director, and ACIP since May 2025 has created even more confusion amongst the parents in my practice that I have to address in real life without the supporting evidentiary support for the vaccination recommendation change that I rely on.

7. With each change by the Secretary, CDC, and ACIP to the CDC childhood immunization schedule, I have also experienced (and continue to experience) an increase in the number of parents in our practice who are becoming emotionally charged and adversarial during vaccine counseling discussions. Mothers have broken down in tears during visits, expressing fear and confusion due to vaccine recommendations by the Secretary, HHS, CDC, and ACIP. At least 4 to 5 parents per day question our practice's vaccine recommendations due to the changes to the CDC childhood immunization schedule by the Secretary, HHS, CDC, and ACIP, which increases the time spent on vaccine counseling by as much as 10 additional minutes per patient visit. This additional counseling time is rarely, if ever, reimbursed and diverts time away from very important aspect of the wellness visit that I no longer have time to focus on because of the increased time I am spending on the changes to the childhood vaccine recommendations. As a result of the increase in time I, along with other physicians at my practice now have to spend on vaccination counseling, we continue to have to change our staffing and operations models.

8. This year, some of our clinicians have asked to work fewer hours, in part so they can take a break from the constant moral injury of patient distrust caused by the Secretary, HHS, CDC, and ACIP actions changing CDC childhood immunization schedule. Although we are not turning any patients away due to lack of provider availability, these reductions have required us to

adjust in other ways. Other clinicians are seeing more patients per day, one clinician has added more hours to her schedule seeing patients that has diverted her time away from doing necessary administrative work such as quality improvement projects, and we ultimately had to hire a new nurse practitioner to maintain coverage. The total reduction in hours across clinicians is about 60% of a full-time position. However, it is not feasible to hire a nurse practitioner at 60% capacity, so the nurse practitioner was hired as a full-time employee. This means paying for the full cost of salary, benefits, medical malpractice insurance, loan repayment, payroll taxes, and other related expenses, adding up to $130,000 annually. Given that we only needed 60% of this capacity, roughly 40% of the cost, or $52,000 annually, represents excess expense driven by the need to replace lost hours rather than truly growing my practice. In addition, the Secretary, ACIP, and CDC changes to the CDC childhood immunization schedule in May, December, and January 5 continue to produce significant administrative burden for me and our practice as I and our staff have to shift around schedules, renegotiate clinician days off, and review provider contracts that are impacted by these childhood schedule changes.

9. Prior to the December ACIP Action, Hepatitis B vaccination was routinely recommended beginning at birth. Counseling on was HepB focused on continuation of the series. ACIP removed the routine recommendation in December 2025, and the January 5 Schedule Change eliminated the birth-dose option entirely and shifted initiation to two months under SCDM. Now newborns increasingly present to my practice unvaccinated against HepB. Initiating HepB counseling at two months is significantly more time-consuming than counseling parents about continuing a vaccine series that began in the hospital. Parents who have already refused the vaccine once are more likely to refuse again. Because newborns appear healthy, some parents treat that observation as evidence that vaccination is unnecessary. Following the ACIP and CDC changes to

5

the childhood schedule for HepB, parents in my practice have become increasingly confrontational during vaccine counseling on HepB, which adds more time to the consultation. For example, in one recent visit, a father became confrontational when HepB vaccination was recommended; despite extended counseling, the family ultimately declined vaccination. The visit consumed substantially more time than it would have prior to the schedule change and was not reimbursed because no vaccine was administered. These types of encounters are becoming more common. This reflects real-world, ongoing behavioral consequences of the schedule changes that significantly impact the physician-patient relationship and operations of my practice.

10. The Secretary's May 19 Directive, December ACIP Action, and the January 5 Schedule Change that each made changes to the CDC childhood immunization schedule have materially altered the way vaccine discussions occur in my exam rooms. These actions signaled to parents that prior childhood vaccine recommendations may have been unsound or politically influenced. That perception, whether accurate or not, is directly affecting clinical operations in my practice. Prior to these changes to the CDC childhood immunization schedule, vaccine administration during well-child visits followed an established, efficient workflow. Vaccines were discussed within a predictable counseling framework grounded in evidence-based ACIP guidance. Since the Secretary's May Directive and additional ACIP and CDC childhood schedule revisions, made without relying on the evidence-based review framework, routine patient visits have become unpredictable and frequently adversarial. The May Directive and January 5 changes to childhood immunizations from routine to SCDM directly increased confusion and fear in our patients and their families, which has increased the amount of time I along with other physicians in my practice must now spend on vaccine counseling. My practice continues to adjust our clinic workflow to

6

address this increased vaccine counseling time spent on the SCDM changes to the CDC childhood immunization schedule.

11. Parents in my practice now increasingly request that vaccine vials be opened and doses drawn up in the exam room in front of them because they do not trust what is being administered. These types of requests began after the Secretary, ACIP, and CDC began making changes to the childhood schedule in May last year and increased following the January 5 Schedule Change. These requests disrupt established safety and efficiency protocols for vaccination, extend room turnover time, delay subsequent appointments, and reduce the total number of patients we can safely see each day. These operational slowdowns are a direct downstream effect of the Secretary's, ACIP's, and CDC's actions that have changed the CDC childhood immunization schedule.

12. The Secretary, CDC, and ACIP's public framing of vaccines as subject to reconsideration or reclassified from "routine" to "SCDM" status, without transparent adherence to the GRADE and EtR framework, has created a perception among parents in my practice that childhood vaccine recommendations are "not important." That instability is manifesting in my clinic as increased questioning, repeated second-guessing of clinical advice, and heightened skepticism toward vaccines and physicians at my practice. These actions by the Secretary, CDC, and ACIP changing the childhood immunization schedule have imposed a real, operational burden on my practice: longer visits, increased staff time per patient, and physician burnout so severe it has required us to hire additional practitioners. In a Medicaid-dependent practice operating on narrow margins, even small reductions in daily patient volume have meaningful financial consequences.

13. The Secretary's May Directive and the ACIP and CDC actions changing the childhood immunization schedule have also altered the emotional environment of my clinic and physician-patient relationship. What were once collaborative vaccine conversations with parents at my practice, are now frequently tense and confrontational. Pediatricians in my practice have experienced encounters in which parents question whether they can "trust" physicians at all due to the childhood schedule changes. These interactions require substantially more time and emotional labor, often result in vaccine refusal, and increase the likelihood of future follow-up visits dedicated solely to revisiting the same disputes. These changes did not arise organically within my community; they followed and correlate directly with the May Directive and the highly publicized ACIP schedule revisions and January 5 Schedule Change. For example, due to the May Directive, a parent has told a pediatrician in my practice "because you pushed Covid vaccination, I won't trust your advice now on any vaccination." Other patients directly cite Denmark's immunization schedule, referenced in the materials accompanying the January 5 Schedule Change, as a reason not to vaccinate their children, which I then have to spend time explaining during the consult (without the benefit of a robust evidentiary review framework for the January 5 Schedule Change).

14. Newborn visits, which historically were among the most rewarding aspects of pediatric practice, are now among the most stressful. The December ACIP Action removing the routine Hepatitis B recommendation, coupled with the January 5 elimination of the birth-dose option, has transformed these visits into high-conflict encounters requiring extra time to discuss the conflicting HepB recommendations. Physicians in my practice increasingly anticipate confrontation when recommending vaccines that were routine and uncontroversial for decades. This pattern has measurably affected clinician morale. Pediatricians in my practice now avoid newborn visits when possible because of the high probability of vaccine conflict. This represents

8

a significant shift in staffing preferences and professional satisfaction that began after the Secretary's Directive and continued following the ACIP and CDC changes to the childhood immunization schedule in December and January. Physician burnout at my practice has increased, and retention risk has correspondingly risen.

15. The cumulative effect of these actions by the Secretary, ACIP, and CDC changing the childhood immunization schedule (by the May Directive, December ACIP Action, and January 5 Schedule Change) is not merely an inconvenience on me and my practice. It is an ongoing and worsening structural strain on my practice: longer visits, lower daily capacity, increased uncompensated labor, rising emotional fatigue, and a deteriorating physician-patient relationship that cannot easily be repaired. Each of these successive actions that changed the CDC childhood immunizations schedule (the May 19 Directive, the December HepB ACIP vote, and the January 5 Schedule Change) has compounded distrust with my patients rather than alleviating it. These harms to me and my practice are cumulative and ongoing. Each of these modifications by the Secretary, ACIP, and CDC to the childhood immunization schedule has and will continue to prolong vaccine counseling time, impede my physician-patient relationship, and destabilize childhood vaccine delivery in my practice.

16. The downstream consequences to me and my practice flowing from the Secretary's May 19 Directive, the ACIP's changes to the CDC childhood immunization schedule, and the January 5 Schedule Change include uncompensated clinical labor, direct financial exposure from potential loss of vaccines through the VFC program, deterioration of physician-patient trust, increased liability risk under expanded SCDM obligations, and rising clinician burnout. Each day that the challenged changes to the CDC childhood immunization schedule remain in effect compounds those harms. Professional goodwill and parental trust, once eroded, cannot simply be

restored. Structural staffing and inventory decisions at our practice made as a result of these changes to the childhood immunization schedule by the Secretary, ACIP, and CDC cannot be immediately reversed without further disruption and expense. The Secretary's May Directive and additional changes to the CDC childhood immunization schedule by ACIP in December and the January 5 Schedule Change have transformed stable pediatric vaccine delivery into an unstable and financially precarious system in my community and my practice. These harms that my practice and I are experiencing as a result of these actions by the Secretary, ACIP, and CDC changing the childhood immunization schedule are immediate, compounding, and ongoing.

17. Prior to these May, December, and January 5 actions by the Secretary, ACIP, and CDC changing the childhood immunization schedule, vaccine counseling with my patients and their parents followed stable, evidence-supported guidance supported by the GRADE and EtR framework. The abrupt reclassification of long-standing childhood immunization recommendations, without adherence to established scientific review processes, introduced confusion and distrust that now manifests daily in my exam rooms. Because the Secretary, ACIP, and CDC did not follow the evidence-based review framework before issuing these changes to the CDC childhood immunization schedule, I do not have the evidentiary support to understand the childhood schedule changes, which further disrupts the physician-patient relationship by interfering with my ability to answer questions from my patients in real time on the changes.

18. The March 18-19, 2026 ACIP meeting notice states that "agenda items are subject to change as priorities dictate." There is a likelihood that the next ACIP Meeting will still include a vote to "align" the VFC program with the January 5 revised childhood immunization schedule and there is a very real risk that vaccines moved to SCDM will be removed entirely from the VFC program. As I stated in my prior declaration, the consequences of such a vote would be immediate

to me and my practice. VFC providers may not administer federally supplied vaccine outside the VFC program. If these vaccines are removed from the program, my practice must immediately stop using VFC inventory for those vaccines. That would require us either to cease offering the vaccines to Medicaid-insured children or to purchase private stock at our own expense.

19. Vaccine procurement requires advance ordering, minimum purchase quantities, and upfront payment. Because the next ACIP Meeting is still imminent and the agenda remains subject to change based on ACIP's undisclosed priorities, I must divert my time and resources to prepare for a VFC vote on the January 5 revised childhood immunization schedule and make purchasing decisions now without knowing whether these vaccines will remain covered under VFC. That uncertainty itself is disruptive to me and my practice. If I reduce orders to limit financial exposure, I risk shortages for children who present for vaccination in the coming weeks. If I purchase additional private inventory in anticipation of removal from VFC, I assume significant financial risk that cannot later be undone.

20. If vaccines are removed from VFC, Medicaid reimbursement mechanisms are unlikely to immediately absorb those costs at market rates. Many vaccines cost my practice $100, $200, or more per dose outside the VFC program. My experience with non-VFC vaccines demonstrates that Medicaid reimbursement frequently falls below acquisition cost. For example, a vaccine costing $120 to acquire may be reimbursed at $80; a vaccine costing $30 may be reimbursed at $20. When multiplied across a high-volume pediatric population, those losses compound rapidly. If vaccines are removed from VFC following the next ACIP Meeting, each administration to a Medicaid-insured child would generate a direct financial loss. Those losses cannot later be recovered from families due to federal billing restrictions–as a Medicaid-participating provider, I am prohibited from charging Medicaid families more than a nominal co-

pay. They also cannot realistically be recouped through retroactive reimbursement adjustments. Once vaccine inventory is purchased or administered at a loss, the financial harm is complete. If I attempted to charge TennCare patients the full cash price of the vaccine to make myself whole, I could be excluded entirely from the Medicaid program. Opting out of TennCare, or risking exclusion from the program, would leave the county my practice serves with no practical medical care for most children. These harms cannot be reversed by a later court ruling.

21. If a provider serves both VFC-eligible and privately insured patients, VFC rules state that the provider must stock both VFC and private inventory for the same vaccine. In rural areas like mine, where access to pediatric care is already limited, many surrounding practices operate on narrow margins and may choose not to stock private inventory of vaccines that cannot also be obtained through VFC. If multiple practices reduce vaccine offerings, families may have no practical local option. My practice cannot absorb unlimited overflow from other providers. In an outbreak situation, I would be forced to ration supply and prioritize existing patients, creating immediate public health risk and operational strain.

22. As a practicing pediatrician responsible for ordering, counseling on, and administering vaccines, many of them through the VFC program, I rely on ACIP's published GRADE evidence summaries, EtR analyses, and explanatory MMWR guidance to guide my conversations with patients and their families and defend my clinical decisions. When a vaccine recommendation changes, I use these resources to understand how to apply the updated guidance to my patients and how to clearly explain the change to them. The GRADE and EtR framework were not followed prior to the issuance of the May Directive, December ACIP Action, and January 5 Schedule Changes that each made changes to the CDC childhood immunization schedule. As a result, I do not have the scientific review framework and underlying evidentiary support and

analysis that I ordinarily use to counsel parents, address concerns, and justify my clinical decisions on the childhood vaccinations impacted by these actions. This lack of information is continuing to compromise my physician-patient relationship and operations of my practice as I do not have the evidentiary foundation to understand the changes to the childhood schedule and answer the questions that I receive from parents in my practice.

23. When CDC childhood immunization schedule recommendations are issued or altered without following the evidence-based review (GRADE and EtR) framework, I am forced to spend additional time independently evaluating what the recommendation actually means, how much weight to give it, and whether it reflects a true change in evidence or a departure from established methodology. That burden does not replace prior work. Instead, it is added on top of my existing clinical responsibilities and diverts from patient care. When this occurs repeatedly, as with the Covid-19 childhood schedule changes, December childhood schedule change, and the January 5 Schedule Change, the harm compounds. I do not have the time or practical ability to reconstruct population-level evidence analyses that the ACIP processes are designed to perform and that I have relied on throughout my entire career as a practicing physician. The deviation from those frameworks increases uncertainty, prolongs patient counseling, and further erodes confidence in my ability to answer questions and provide recommendations to my patients on these vaccinations, pushing my clinical practice toward a breaking point.

24. The scientific assessment memo issued alongside the January 5 Schedule Change did not follow the established GRADE or EtR framework and cannot substitute for it. No supporting MMWR was issued. Without these materials, I lack the evidentiary tools I ordinarily use to explain changes to parents.  If ACIP removes vaccines from VFC at the March 18-19 ACIP meeting based on this truncated process, I will be required to implement immediate programmatic

13

changes without being able to reference a recognized evidentiary framework. That undermines parental confidence and directly impairs my ability to practice evidence-based medicine. If ACIP votes to remove several vaccines from the VFC program using the scientific assessment and decision memo, the impact will worsen as I have to explain the changes to families in my practice seeking to understand why certain recommendations have shifted and why vaccine access through the VFC program has changed. This is especially disruptive for my practice where the vast majority of my patients are VFC-eligible.

25. Without GRADE tables, EtR analyses, or an MMWR explaining the rationale and scope of the January 5 Schedule Change, I cannot provide the level of evidence-based explanation that parents in my practice reasonably expect. If ACIP votes during its next meeting on March 18-19 to remove vaccines from VFC program based on the January 5 revised childhood schedule, the harm will escalate. I will be required to implement changes affecting VFC-eligible children in my practice while still lacking the robust, scientific analysis and written guidance necessary to explain the change and maintain parental confidence. That combination, mandatory programmatic change without the robust evidentiary foundation and review process that I can reference, creates immediate and serious disruption in the care I provide to the children and their parents in my practice.

26. If the ACIP votes to remove the vaccines that were downgraded as a result of the January 5 Schedule Change from the VFC program at the upcoming March 18-19 ACIP meeting, I will be forced to make immediate decisions about inventory, reimbursement risk, and whether I can continue offering these vaccines to the majority of my patients. Those consequences occur at the time of the vote and implementation (not months later); as a result, I have to continue to take action now to attempt to prepare my practice for this likely vote. In addition, missed vaccination

14

opportunities cannot be recreated. Financial losses incurred by my practice from unreimbursed vaccine administration cannot be recovered. Once my practice adjusts inventory, participation, or service offerings, those structural changes cannot be quickly reversed. If vaccines reclassified under the January 5 Schedule Change are removed from VFC, the financial and operational harms described above will escalate immediately. As a practicing pediatrician and practice owner, permitting the next ACIP Meeting to proceed under these circumstances will cause immediate, concrete, and devastating harm to me and my practice and to the stability of vaccine delivery in my community.

I declare under penalty of perjury and laws of the United States, including 28 U.S.C.§ 1746, and the laws of Tennessee, that the foregoing is true and correct.

Executed on February 26, 2026 in Crossville, Tennessee.

/s/ *Suzanne Berman*

Dr. Suzanne Berman

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the court's Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on March 13, 2026.

                                          */s/ James J. Oh*
                                          James J. Oh